82 F.2d 277 (1936)
In re H. HICKS & SON, Inc.
GODOY
v.
GEORGE ALEXANDER & SONS, Inc.
No. 224.
Circuit Court of Appeals, Second Circuit.
February 10, 1936.
*278 Joseph B. Finkelstein, of New York City, for appellant.
Samuel Robert Weltz, of New York City, for appellee.
Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.
L. HAND, Circuit Judge.
This appeal is from an order in bankruptcy expunging a claim against the estate. The claimant is the assignee of the Hicks-Downs Realty Company, a corporation all but 25 of whose 1000 shares were owned by one Maria C. Downs, who also owned all the shares of the bankrupt. The claim is for past rent due upon a lease executed to the bankrupt under which it occupied the premises in which its business went on, and for a loan of $5,000 made to the bankrupt in January, 1931. The lessor had been incorporated in 1919 to take over some parcels of land on Fifth avenue, New York; all its shares were taken up by the husband of Maria C. Downs. In 1920 it leased the ground floor of these premises for $24,000 a year to the bankrupt whose shares were similarly held. In 1924 Mr. Downs died and his widow became the owner of all the shares in both lessor and lessee; she has since then transferred 25 shares in the lessor to her brother, the assignee and claimant at bar. Since we regard the transactions between the two companies as not actually creating any obligations, it is necessary to state the evidence in some detail. In 1926 the lessor owed the bankrupt $63,000 and of this $50,000 was canceled by the transfer by Mrs. Downs of one-half the shares in the bankrupt to the lessor, which in turn transferred them to the bankrupt. It is possible to regard the transfer to a company of its own shares as a beneficial consideration, that is, if one treats the company as merely the group of shareholders; a part of the group retires and the remainder is enriched in proportion. But in the case at bar although the lessor received the shares from Mrs. Downs, the gift did not affect her interest in the bankrupt because she was already the owner of all the shares in the lessor. After the transaction, as before, she remained the sole shareholder of both companies; all that had happened was to wipe out $50,000 of the bankrupt's assets. Although this transaction is not directly relevant to the transactions at bar, it is evidence of the capricious treatment of the two companies by Mrs. Downs, and as such it throws light upon the actual intent which underlay the lease and the loan at their later inception.
In October, 1928, a new lease was substituted for that of 1920, in which the rent was raised from $24,000 to $36,000; this lease is the source of that part of the claim which arises from rent. The bankrupt never paid any rent under it, though all the other tenants of the building did. We do not forget that some time in 1931 a credit was given to it for more than $8,000, which was applied upon past rent, but the basis for this has not been disclosed; so far as appears it stands upon the mere fiat of the bookkeeper. Mrs. Downs swore that she made "an allowance of $20,000" to the bankrupt for the year 1930, thus reducing it to $16,000; this stands solely upon her word; on January 27, 1932, however, she had her secretary enter upon the lessor's minutes a resolution that the rent for 1931 was "waived." By June, 1932, she had come into difficulties with the mortgagee of the reversion, and to satisfy him she prepared a new lease on June 15, 1932, this time at a rental of $24,000, which she assigned to him; the bankrupt for a season paid the rent reserved on this lease. The lessor's books contain a lead pencil entry as of November, 1932, canceling not only all claim for past-due rent, but the loan to the bankrupt of January, 1931; when a new set of books was opened in January, 1933, these two items were omitted. Mrs. Downs prepared a financial statement of the bankrupt's affairs which she showed in January, 1933, to one of its creditors, who thereafter continued to deal with it; this statement did not include either of these items. She met all the creditors in the following March and gave them a list of the bankrupt's liabilities; again the items were suppressed. In May she was examined in supplementary proceedings and concealed both debts; she verified the bankrupt's schedules, which also were silent; when examined about them she swore that the schedules were correct. *279 It was only after the bankrupt estate was sold that she interposed the claim in her brother's name; even then her position was inconsistent, for although she swore in a supporting affidavit that the rent had fallen due in 1931 and 1932, the claimant does not now press for 1931, but says that $13,700 is for rent falling due in 1930.
The referee, finding that there was adequate formal evidence to establish both debts, and believing that two corporations might contract with each other though their shares were held in common, allowed the claim; he could not see that the debts had been legally discharged. The judge expunged the claim, because the lessor had "waived" the debt by its constant equivocation. We should find some difficulty in concluding, if the debts had ever come into being at all, that they had been discharged. There was no release; there was no accord and satisfaction; there was no estoppel, at least as to all the creditors; a creditor does not discharge a debt by acting inconsistently in regard to it, or indeed even by expressly declaring that he forgives it. Nevertheless, it appears to us that the lease and the loan did not create any obligation at the outset; that they were mere forms, intended never to become binding on the companies, and for that reason never contracts. It is well settled that whatever the formal documentary evidence, the parties to a legal transaction may always show that they understood a purported contract not to bind them; it may, for example, be a joke, or a disguise to deceive others. New York Trust Co. v. Island Oil & Transport Corporation, 34 F.(2d) 655 (C.C.A.2); Lavalleur v. Hahn, 152 Iowa, 649, 132 N.W. 877, 39 L.R.A.(N.S.) 24; Humphrey v. Timken Carriage Co., 12 Okl. 413, 75 P. 528; Coffman v. Malone, 98 Neb. 819, 154 N.W. 726, L.R.A.1917B, 258; Southern St. Ry. Adv. Co. v. Metropole Shoe Mfg. Co., 91 Md. 61, 46 A. 513; Keller v. Holderman, 11 Mich. 248, 83 Am.Dec. 737; McClurg v. Terry, 21 N.J.Eq. 225; Bell et al. v. Mulkey (Tex.Civ. App.) 248 S.W. 784, 785; Williston, § 21; Restatement of Contracts, § 71 (c). It is no objection that such an understanding contradicts the writing; a writing is conclusive only so far as the parties intend it to be the authoritative memorial of the transaction. Whatever the presumptions, their actual understanding may always be shown except in so far as expressly or implicitly they have agreed that the writing alone shall control. While it is true that an intent to make a contract is not necessary to the creation of a contract and that parties who exchange promises will find themselves bound, whatever they may have thought, nevertheless they will not be bound if they agree that their words, however coërcive in form, shall not bind them.
A contract between two companies all of whose shares are held by a single shareholder, in a fundamental sense cannot create an obligation, for an obligation implies a power in one person to control, to coërce, the will of another, and there is only one will concerned. Here, for example, Mrs. Downs could not in the nature of things compel herself to make these payments if her purpose to pay them should change. When we say therefore that two companies so controlled may make a contract, no meaning can be attached to it but this, that the interests of others may intervene in such a way as to measure the companies' interests just as though they had created obligations between themselves. This is such a situation because the lessor, or more properly Mrs. Downs in the mask of the lessor, is asking for a dividend in competition with other creditors. Contracts resulted upon their execution if she then meant to bind the companies quoad the creditors of both; but if she did not, and only meant to use the evidence of the contracts as her subsequent needs might dictate, they always remained mere forms as of necessity they had to be between the companies themselves.
Therefore it may not be immediately relevant that the bankrupt was forgiven the rent or that its amount was changed; that does not prove that the contracts had not been intended to stand against the interests of creditors. But playing fast and loose, after the rights of creditors came in prospect, was quite different. In November, 1932, and steadily thereafter there were repeated evidences that the contracts were not then at least intended as claims against other creditors; not only does this follow from the books but from Mrs. Downs's deliberate declarations, sworn and unsworn. She only meant to hold them in reserve, using or suppressing them as she found convenient; such an intent would negative any obligation, at least if it went back to the time of execution. Thus the last question is whether the evidence is enough to carry back that intent to that time. Most of it related to later transactions, all indeed except the shuffling back and forth of the debt *280 of 1926. But we see no reason to cut the web in halves; we find a continuous and consistent practice, looking one way, indicating that the putative obligations created were only phantoms, evoked or laid at rest at the whim of this lady to satisfy her momentary interest. The reasonable conclusion is that her intent never changed; at no time did she mean her corporate puppets to engage in transactions which would later handicap her absolute freedom of action.
Order affirmed.