## MASON v. ROSE.

United States District Court
S. D. New York.

July 7, 1948.

Schwartz & Frolich, New York City (Louis D. Frolich, Arthur H. Schwartz, Everett A. Frolich, Herbert P. Jacoby, New York City, of counsel), for plaintiff.

Simpson, Thacher & Bartlett, New York City (Richard B. Persinger, Marshall A. Jacobs, New York City, of counsel), for defendant.

KNOX, District Judge.

Plaintiff is an actor of distinction and unique ability. His stage career in England begain in 1931, and since 1933, he has there performed in numerous motion pictures. He became a featured player in 1937, his name appearing immediately below the film title. Since 1938, he has been starred, that is, his name has appeared

above the film title. Plaintiff's popularity was considerably enhanced by a picture in which he starred in 1943. Thereafter, his English success was assured, and he became widely known in the United States and other countries where these films have been exhibited.

Defendant is a motion picture executive with over twenty years experience in the industry. In 1938, he went to England and became manager of all the Paramount companies in that country, these companies being wholly owned subsidiaries of a major American film producing corporation.

Toward the end of 1945, plaintiff and defendant entered into negotiations with respect to the consummation of a contract between plaintiff and the parent Paramount Company whereby plaintiff would here make pictures for that organization. However, no contract was signed, Paramount refusing Mason's terms in early 1946. Thereafter, Mason and Rose gave consideration to the possibility of making a contract between themselves, the basic notion being the establishment of an independent producing corporation in the United States. Pictures were to be made here, and the parties themselves were to own the production corporation. Its principal asset would be the services of plaintiff. These negotiations resulted in a writing which reads as follows:

"Claridge's
"Brook Street, W.1
"5th June, 1946
"James Mason, Esq.,
"Olleberrie Farm,
"Delaize,
"Sarratt,
"HERTS.

"Dear James:

"1. Confirming our agreement I will form an American Company before you go to America next fall for the purpose of producing films starring yourself. The shares of this Company are to be divided equally between us, i. e. 50% to you and 50% to me. It is understood that this split may be altered later if say an ace director, agreeable to both of us, comes into the Company and we agree to give him some of the shares.

"2. I undertake to make all financial arrangements for the production and distribution of films made by our Company and generally to manage the Company.

"3. The story, script, director and cast of each film made by the Company are to be approved by you.

"4. Commencing not later than sixty days after your arrival in California next fall, the Company will pay you salary of $2,000.—(two thousand dollars) per week and commencing at the same time the Company will pay me salary of $1,000.—(one thousand dollars) per week. The Company will advance your travelling and other expenses until your salary commences.

"5. You agree to give the Company your exclusive services for at least five years and the Company will agree to make at least two pictures per year commencing from the date you are ready to start work in California. It is intended that all pictures in which you appear are to be produced by our Company but if at any time you find a good story in which you wish to appear and our Company is unable to either acquire the film rights in the story or make a deal with the person firm or company owning such rights for the production of a picture based thereon, then in these circumstances it will be agreed that our Company will approve a loan out of your services to such other Company for the purposes of such picture.

"The above sets forth the agreement made between us to which I agree.

"Yours sincerely,
"/s/ D. E. Rose

"I agree the above
"/s/ James Mason"

Due to differences between the parties, the terms of the foregoing writing have never been executed. Mason came to this country about a year and a half ago. Despite his popularity as an actor, he has been unable to obtain any employment in the motion picture industry. Potential employers are unwilling to assume the risk of a lawsuit with Rose.

Shortly after Mason's arrival in New York, Rose filed suit against him in California, alleging a contract for Mason's exclusive services. Mason never having

been in California, process could not be served upon him. Nevertheless, the trade papers reported the filing of the complaint, and it may be safely assumed that all large producing companies are aware of the claims that Rose asserts.

In the summer of 1947, Mason negotiated a contract with Universal Pictures Company, a major studio, under which he was to produce and star in a film to be financed and distributed by Universal. After the contract was reduced to writing and ready for signature, Universal, on the advice of counsel, refused to execute the agreement unless Rose would agree to limit himself in a suit against Mason, and make no claim against the corporation. Defendant refused to comply with this request. As a result, the proposed contract was never signed.

Plaintiff now seeks to a judgment which will declare that the above document, dated June 5, 1946, does not constitute a binding agreement inasmuch as it was not intended to be a contract, and because, also, its provisions are not sufficiently definite, certain and complete as to be binding upon the parties. Alternatively, if the writing does constitute a contract, plaintiff asserts that defendant has breached and abandoned the same. Aside from a general denial of plaintiff's averments, Rose has interposed a counterclaim in which he asks that Mason be enjoined from exercising his talents for persons other than himself, and that he be awarded damages for plaintiff's default.

In making approach to the question as to whether the memorandum of June 5, 1946 was intended to be a contract, the first problem that presents itself is as to the admissibility of evidence which will throw light on the intention of the parties. The document in question was signed in England, appears to call for performance in California, and is sued on here. Under ordinary circumstances, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, would require me to decide whether the admissibility of evidence of intention is procedural or substantive, and if the latter, to determine the applicable law of this state. Sampson v. Channell, 1 Cir.; 110 P.2d 754, 128 A.L.R.

394; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. Fortunately, these problems can be avoided inasmuch as in each of the above mentioned jurisdictions such evidence is admissible. Hussy v. Horne-Payne, 4 App. Cas. 311 (1879); Pattle v. Hornibrook, 1 Ch. 25, 17 Digest 308, 197 (1897); Pym v. Campbell, 6 E. & B. 373, 374, 25 L.J. 277 Q.B.; California Code of Civil Procedure, sec. 1856; In re H. Hicks & Son, 2 Cir., 1936, 82 F.2d 277; Grierson v. Mason, 1875, 60 N.Y. 394.

If it were necessary to say that a contract was intended on the basis of the testimony that is before me, and particularly as to what transpired prior to June 5, 1946, it would be difficult to reach a satisfactory conclusion. The parties undoubtedly had a conversation on the subject prior to April 3, 1946, and at that time Mason was "sold" on the proposals suggested by Rose. And, as Mason said in a letter to Rose, he desired that a draft memorandum be drawn up. Mason again requested a draft memorandum in the middle of April, and sometime between mid-April and May 20, 1946, certain sketchy proposals were drawn up by a lawyer named Davis, and who was closely associated with the British Paramount Companies, and these were submitted to Mason by Rose. For the rest, the testimony is in hopeless conflict.

Plaintiff says that Rose first broached the idea of an independent company; Rose claims it was Mason. Mason asserts that the proposition was first discussed at a meeting toward the end of March, 1946, and that there were no extended discussions between that time and the meeting that was held at Mason's home on June 5th, when the document in suit came into existence. Mason further avers that the proposals prepared after mid-April were handed to him while he was on a movie set at the Denham studios and that he had no opportunity to discuss them. Mason denied that any preliminary draft of the June 5th letter was presented to him.

Rose, on the other hand, declares there was a conference at Mason's home before the end of March, at which time Mason suggested the entire scheme. Rose also tes-

tified that there were other lengthy discussions at plaintiff's home, one in mid-April, one in mid-May, and one at the end of May. According to him, the details of the proposed corporation, including the method of financing it were discussed thoroughly and specifically. He further declared that the written proposals were submitted at the mid-May discussion, and that a draft of the June 5th letter, which was not produced on the trial, was discussed for about four hours at the meeting held in the latter part of May.

Davis, the English solicitor, who testified for the defendant, was admittedly present at the end of March meeting, and at the one held on June 5th. Rose says that Davis was also present at the mid-May discussion, but the latter declared, on direct examination, that he was "hazy" as to this, and on cross-examination he said "I can't recall."

There is a similar conflict in the testimony as to what transpired at Mason's home on June 5th, when the writing was signed. Admittedly, Rose was planning to leave very shortly for America. Plaintiff's version is that Rose said he wanted the signed letter so that he could have something to show to American producers, directors, and writers, and to indicate that he was "a person in authority" when he discussed with them the possibilities of deals between them and the projected Mason-Rose Company. Mason's recollection is that he questioned the formality of the writing of June 5, 1946, and that his wife, Pamela Mason, suggested that perhaps a lawyer should be consulted. As to this subject matter, Mason testified: "Davis laughed at her and he said, 'My dear Pam, you know what a contract looks like. You cannot possibly think that this is intended to be a contract, and you remember the contract we worked out together, the one on 'Odd Man Out', that was a 12 page document very detailed, very carefully drawn out and drafts discussed and everything, whereas this is just what it should be. It is something to prove that he is speaking with authority.'"

Mason also said that he questioned several phrases in the letter, as expressing more than had been agreed to, but that

he consented to sign the letter as an indication of Rose's authority to speak for him in America. The understanding, according to plaintiff, was that the questionable items, and other details that were to be agreed upon before a contract could be drawn—some of which Mason testified to as having been explicitly mentioned—would be thrashed out in the future discussions to be had between Rose and Al Parker, Mason's agent.

The Rose and Davis versions, as to what transpired, are to the contrary. According to them, no one doubted that a contract was being signed. The letter was produced; Mason and Mrs. Mason read it, and Mason then signed four copies. Nothing, say Rose and Davis, was mentioned about signing the paper for a special purpose, or to the effect that a contract wasn't being signed, or that there would be further negotiations.

Events subsequent to June 5th shed a fair degree of light on the intentions of the parties. Immediately after that date, Rose left for the United States, and did not return to England until late July. Rose testified that he resigned from Paramount by oral notice to Balaban, the President of Paramount, and that he instructed his California lawyer to form a California corporation. Papers for such corporation were filed in September.

The happenings following June 5, 1946 may be divided into five incidents. Chronologically, they are these: (1) a dispute between Mason and Rose having to do with publicity; (2) another one concerning the articles of association of the corporation; (3) one which touched on Mason's right to produce free lance pictures; (4) Rose's proposal of a Mason-Paramount contract as an alternative to the June 5th arrangement, and (5) the Zagon conference in London. Testimony as to subsequent events is worthless. By that time, the positions taken in this suit had thoroughly solidified.

### (1) The dispute having to do with publicity.

In early August, or before, statements had appeared in the trade press suggesting

304

that a Mason-Rose agreement had been reached. When Rose returned to England, the parties met and decided it would be advisable to issue an accurate statement. It was agreed that Rose would draft the statement, but that Mason should pass on its contents before release. The Mason version is that Rose failed to submit the draft to him, and that his first notice of it was on August 19th when he read stories in the press that were obviously derived from a statement by Rose. In the press, this release was headed: "David Rose signs a Five-Year Pact with James Mason." In part, it reads as follows: "David E. Rose announces that he has signed an agreement for five years with James Mason to become associated with and star in David Rose Productions * * *."

Mason thereupon issued two statements—one apparently to an American trade paper, and the other to the English press. alia, the following: "James Mason and David Rose are to be partners in a new production company. * * * The company will produce other films beside those in which Mason will star. Irrespective of this arrangement, he will continue to work for other companies as a free lance actor."

The English release, dated August 19th, is headed: "James Mason Forms Producing Company" and states that Mason "is forming a company in Hollywood with David Rose to make films in which he will take an active interest on the production side and act as associate producer. He will not necessarily star in all the pictures that his Company produces, but will leave himself free to accept starring roles in other companies' productions * * *."

Both of the Mason releases mention the possibility of Mason starring in "A Lady Possessed," a story written by Mrs. Mason; The American one mentions the possibility that Mason's first Hollywood film might be for Selznick, the English one that the first picture might be for R.K.O. Rose, thereupon, objected to Mason having issued his statements without consulting him. Mason replied that the Rose release had given a wrong impression as to the relationship existing between them.

The Rose testimony is that Mason had approved the former's statement before its release, and his entire version of the facts differs materially from that of the plaintiff.

### (2) Dispute about articles of incorporation.

On August 27th, just before again departing for America, Rose wrote Mason that in confirmation of a telephone conversation had between them, he would send Mason a copy of "our American Articles of Incorporation" as soon as they were prepared. On August 29th Mason wrote to Rose in California, via air mail, demanding that he see the "Draft" articles before the company should actually be incorporated. But this did not come to pass.

Mason first received a copy of the articles of incorporation in a letter dated September 9, 1946, which was sent to him by George Cohen, Rose's California lawyer. This letter stated: "The original of the enclosed articles has been forwarded to the Secretary of State of the State of California today." Under date of September 23, Mason wrote Cohen and said that he was not prepared to bind himself to give services to the company so formed.

At the trial, an impression was created that Rose hadn't sent Mason the draft articles because the Mason letter demanding a copy of the same had not been received until it was too late to comply with the request. Rose had informed Mason he would arrive in California on September 6th. As the Mason letter was addressed to California, it was the contention of counsel for Rose that "this letter of insistence * * * of asking for the articles of association, was actually received in California after they had already been sent out to the Secretary of State, and that they were properly sent to him. On this point, Rose was not as clear as his counsel. Rose testified that he didn't remember when he arrived in California, but that when he did receive the letter he turned it over to Cohen, "and I think he told me at the time that the articles, a copy of the articles, have already been mailed."

(3) Dispute about Mason's free-lancing.

This controversy arose early and was a continuous source of disputation. Mason was anxious to do a free-lance picture for Selznick or R.K.O. as his first Hollywood performance. Apparently, there had been some hopeful discussion between Al Parker, Mason's agent, and representatives of these producers. The matter was mentioned in Mason's two press releases, and was the main burden of a letter "written in heat" on Tuesday, August 20th or 27th. Mason wrote: "At present the Mason-Rose organization has no program and I must find my next picture. The virtue of our arrangement is that when we want to make specific subjects we make them together. But the idea that you are to okay my subjects is absurd because it entirely destroys my artistic freedom which was the essence of the arrangement. * * * I don't wish to be indebted to the company to the extent of six month's living and traveling expenses for my large menage before I have earned a penny for the company. I'd rather earn my keep as I go along." Following this letter a meeting was arranged, but no agreement was reached.

On August 30th Rose wired from New York that it was advisable for tax reasons to make the first film through the newly organized company. He thought Selznick could be brought to this view. Mason replied by wire that he was "quite prepared to pay full tax," and suggested that his first picture be free-lanced. He thought the Selznick picture could be so scheduled that the R.K.O. picture could also be done.

(4) Rose's proposal of an alternative Mason-Paramount contract.

In September Rose went to California and there negotiated a draft contract under which Mason would work for Paramount as an actor, making as many as ten pictures over a five year period, but without the artistic freedom that Mason values so highly. Concurrently, Paramount and Rose agreed that if Mason would sign the draft contract, Mason and Rose should cancel the June 5th agreement. Rose was to receive $25,000. for each picture Mason made, but not over $250,000. The contract also contained the following clause: "Nothing contained herein shall be construed as a waiver, release or discharge by Paramount or Rose of any claim or claims of any nature whatsoever which either party may have against the other; provided, however, that if an agreement between Paramount and Mason shall be entered into as set forth in this letter agreement, then upon the execution and delivery thereof, both Paramount and Rose shall be deemed released and discharged of any and all claims against each other except for such obligations as are specifically provided for in this letter agreement."

When Rose next returned to England, he took along the draft contract. He visited Mason at his home in late September or early October. The accounts of this meeting are in dispute. Mason says that Rose then declared that he was in an embarrassing position with Paramount, inasmuch as he had personally negotiated with Mason while he was still in Paramount's employ. As to Rose's compensation, he quoted Rose as saying: "Well, seeing that as a result of this participation clause * * * you will be due to get millions and you will be very rich, then you won't notice it if you pay a small percentage to me." Rose denied having been in an embarrassing position with Paramount.

Upon Rose's own statements with respect to his relationship with Paramount, it is difficult to understand why he should have a claim against the company if he were obliged to pay a Federal income tax on his salary, which was his explanation of the clause. Furthermore, his testimony does not satisfactorily explain why the proposed contract makes reference to a claim that Paramount might assert against him. Still further, it is by no means clear why Rose's alleged right against Paramount should be exhausted in the event that Mason signed the contract with that corporation.

On direct examination with respect to the above mentioned meeting, Rose said he told Mason he was to be compensated

by Paramount, but did not tell him what that compensation would be. On cross-examination he stated that he never informed Mason of compensation he was to receive from Paramount.

### (5) The Zagon meeting.

Zagon is an American lawyer who represents Al Parker in the United States. In early October of 1946, he was in England, and a meeting was arranged for October 8th between Rose, Davis and Zagon ·to see what could be worked out, Zagon representing Mason. The accounts of what took place at this conference are in dispute. Zagon deposed that Rose said he stood to make $500,000. out of the Mason-Paramount deal, and therefore would settle his disputes with Mason for that sum, and nothing less. Rose denied that he made this statement. Rose and Davis, the English lawyer, testified that Zagon had said that, although he was not authorized to make any such offer, he would suggest a settlement by which Mason would pay $250,000. for release of his obligations to Rose. Zagon's testimony is not in accord. The Rose version has some corroboration from the contents of a letter from Davis to Rose in which Davis recommended that Rose accept the $250,000. · When asked why he declined the offer suggested by Zagon, as he said, when he stood to make the same sum if Mason signed with Paramount, Rose testified that the Paramount deal was "for cash." Zagon's testimony is to the effect that Rose informed him that he would be compensated by Paramount if Mason signed with that Company, and that he, Zagon, communicated this to Mason.

In summing up what transpired after June 5th, it can fairly be said that the area of disagreement between the parties was more than sufficient to bring about a complete collapse of a cooperative relationship, except insofar as they were contractually obligated to each other.

In the publicity dispute, Mason seemed explicitly to acknowledge that he had reached an agreement with Rose. His insistence that he be consulted on the draft articles of incorporation, and his statement that he could not consider himself bound to the company because he had not been consulted on the draft, tends to that conclusion. In the dispute over free-lancing, his contention seems to have been that he could free-lance under the June 5th agreement, or because Rose had not yet arranged to operate under the agreement, but not that he could free-lance because there was no agreement. And when Rose submitted the Mason-Paramount contract Mason's principal reaction seems to have been shock that Rose should have abandoned the original agreement.

This conduct, of course, may be attributable to other motives. It is possible that Mason felt morally obligated to continue negotiations looking toward a complete agreement, or that he actually continued to desire to enter into a contract with Rose. It may also be that he believed that whether or not he had intended to enter a contract on June 5th was legally irrelevant,—the paper being a contract whatever he intended—or perhaps he thought that while intention was relevant, he could not prove his own. Nevertheless, in the light of all the testimony, plaintiff's conduct would seem to indicate that he really intended on June 5th, 1946, to enter into a binding contract. Similarly, I find that Rose intended to make the agreement.

In support of this conclusion it is to be noted that plaintiff has the burden of establishing that no contract was consummated.

Plaintiff would have the burden of showing there was no intention to enter into an agreement if this were an ordinary suit on a contract, and he does not free himself of the burden because he is plaintiff here.

Attention will now be directed to plaintiff's contention that if there was a contract between himself and Rose, the latter breached it by repudiation and abandonment. Reliance is placed on the Paramount-Mason and Paramount-Rose contracts as evidence of repudiation. It seems to me, however, that if this alternative proposal by Rose can be considered as being in derogation of his obligations under the original agreement, which is highly doubt-

ful, that Rose was fully justified in believing that alternative proposals were in order inasmuch as Mason would not carry out the terms of the June 5th understanding. I think there is no fatal inconsistency in relying on Mason's conduct after June 5th to find he intended to enter into a contract on that date, and to hold that his subsequent conduct would justify Rose in believing Mason would not go through the deal. The real question in issue is one of intent, and that depends on evidence; and as I interpret the testimony, Mason believed himself to be obligated to Rose, but was unwilling to discharge his obligation.

Having reached these conclusions, it becomes necessary to examine the law to determine whether the contract was sufficiently definite, certain, and complete to be binding on the parties.

■ This is a question of substantive law. Under the Sampson and Klaxon cases, supra, this Court, on such a question, must follow the New York rule on conflicts of law. This, unfortunately, is not clear. As stated in the New York annotations to the Restatement of Conflicts (Section 332) the New York law is "unsettled." As a matter of making of the contract, the place of its performance, the place the parties intended, the place indicated by grouping the various elements, and alternative places suggested by the various contacts. If any rule predominates it is the place of making rule, which is the Restatement rule. Cf. Jones v. Metropolitan Life Insurance Co., 1936, 158 Misc. 466, 286 N.Y.S. 4.

Counsel for the parties have called attention to two English cases which touch upon this subject matter. My own research has failed to reveal any other pertinent English opinion. The cases for consideration are Waring & Gillow (Ltd.) v. Thompson, 29 Times Law Reports 154 (Court of Appeals, 1912), and Triefus v. Winston, 85 Sol. J. 10(K.B.1940). In the first of these, plaintiff was an English company engaged in selling household equipment in the Argentine. Defendant was engaged in the identical business. To lessen competition between them, they discussed the advisability of creating a new company in the Argentine which they would jointly own. On February 24, 1908, a document in the form of a memorandum appended to certain heads of agreement was signed by the parties. That document contemplated the transfer by plaintiff of its existing business to the new company which was to have a capital of five thousand pounds. In exchange for its assets, plaintiff was to receive their value as of a specified date, half in cash and half in the preferred stock of the new company. The written agreement, however, made no provisions regarding the details of the corporate organization, the dividends to be paid on the preferred stock, the nature of the articles of association or the borrowing and other powers of the company, or as to the share of profits which plaintiff was to receive.

The Trial Court, holding that the writing between the parties did not constitute a contract, stated that the document "left open for agreement a number of points, e. g.: the memorandum and articles of association, the borrowing and other powers of the company, and the plaintiff's percentage of profit."

On appeal, this result was affirmed. The reviewing court relied principally on its finding that time was of the essence of the agreement. However, the court also approved the lower court's ruling that the agreement was too indefinite. In this connection, Lord Justice Buckley said:

"He thought the agreement was an agreement to cooperate in registering a company, floating it in the sense of endeavoring to obtain a subscription of its capital, and further clothing it with the business by willingness to assume towards the new company when registered the position of a vendor upon the terms appearing in the heads of agreement.

\* \* \* \* \* \*

"Waring & Gillows (Ltd.) were, in fact, bringing nothing to the joint undertaking beyond their experience and the goodwill of such business as they had in the Argentine, so that the large sum which they were to receive was really paid only to ensure (1) negatively, absence of competition by them; and (2) affirmatively, the benefit of their assistance in the Argentine business. For these reasons his Lordship thought that

there were essential terms upon which the parties had not come to any agreement, from which it resulted that there was no agreement."

On the other hand, Triefus v. Winston was a case of an alleged partnership to buy and resell a certain 726 carat diamond recently discovered. While the report is incomplete, the Court thought the agreement good although there were many matters still to be settled between the parties.

Looking now to the California decisions, two cases are in point. In Detwiler v. Clune, 1926, 77 Cal.App. 562, 247 P. 264, defendant owned the motion picture rights to a novel, and entered into contracts with several people to obtain funds for the production of a motion picture. The investors were to receive a dollar for dollar return out of net profits on their original contribution, and were then to receive 60% of further profits. The Court was principally concerned with whether the contract as written could be construed as a contract to form a corporation. Once this was decided in the affirmative, there was no question but that the contract was valid, although the only item fixed was the amount of each subscription.

In Meyers v. Nolan, 1937, 18 Cal.App.2d 319, 63 P.2d 1216, plaintiff's assignor was employed as defendant's personal representative and manager in the motion picture industry for a five year term. Defendant agreed not to employ anyone else in this capacity; the services of the manager were explicitly not required to be exclusive; the manager was to receive 10% of defendant's earnings, however, the contracts for such earnings were secured; and either party could cancel if defendant had no employment for four months. This contract was upheld against an attack based on lack of definiteness and mutuality. The Court said the contract meant that the manager would put forth his "best efforts." Cf. Hopper v. Lennen & Mitchell, D.C.So.Cal., 1943, 52 F.Supp. 319, affirmed in part and reversed in part on another point, 9 Cir., 1944, 146 F.2d 364, 161 A.L.R. 282.

Both parties have cited numerous New York authorities. Perhaps the strongest case for defendant is Manny v. Burke, 1916, 174 App.Div. 654, 160 N.Y.S. 879, from which I quote:

"The complaint alleges an agreement between the defendant, who 'is well and favorably known as a producer and promoter of vaudeville entertainment,' and the plaintiff who 'possesses unique, unusual and extraordinary ability as a violinist and an actor, and particularly adapted for the portrayal of the character of entertainment that is about to be presented by said Mr. Burke.'

"The agreement recited that the parties 'desire to become associated together in the production and presentation of said entertainment to be provided by said Mr. Burke in vaudeville, theaters, and other places of amusement,' and provided that the defendant is to produce and finance the entertainment and be the general manager thereof, and provided, among other things, that the plaintiff 'is to devote his entire time and his best ability to the portrayal of the leading male role or rendition of such other service as Mr. Burke may direct in the entertainment to be provided by said Mr. Burke in vaudeville theaters, and other places of amusement as Mr. Burke may from time to time determine.' The agreement also provided that, after the net proceeds of the entertainment repaid the money advanced by the defendant, the parties were to share equally in the profits and losses of the enterprise. Apparently the plaintiff was to receive no other compensation. The agreement was to continue for three full theatrical seasons from September 1, 1913."

The agreement was upheld. New York law does not favor the defense of lack of mutuality. Two important decisions by Justice Cardozo established the doctrine. Moran v. Standard Oil Co., 1914, 211 N.Y. 187, 105 N.E. 217, 220, was a suit on a contract under which plaintiff agreed to sell defendant's paint for five years and defendant agreed to pay commissions. On mutuality the Court had this to say: "The trial judge held that the contract imposed no obligation on the defendant to employ the plaintiff for five years, and that at the defendant's option it was terminable at will.

We cannot accept that construction of its meaning. An intention to make so one-sided an agreement is not to be readily inferred. * * * The contract was drawn by the defendant's lawyers, and was tendered to the plaintiff with the assurance, as he says, that his future for the next five years would be secure. Since the language is the defendant's we must construe it, if its meaning is doubtful, most favorably to the plaintiff. * * * We must also give its words the meaning which the defendant ought reasonably to have understood that the plaintiff would put upon them."

The leading New York decision is Wood v. Lucy, Lady Duff-Gordon, 1917, 222 N.Y. 88, 118 N.E. 214. Defendant was a creator of styles. She employed plaintiff to capitalize on the value which the public placed upon her approval of articles of clothing. Plaintiff was given the exclusive rights, subject to her approval, to place her endorsements on others' designs, and the exclusive right to sell her designs, in return for which defendant was to have one-half the profits. Although the contract had a "wealth of recitals" defendant claimed lack of mutuality. The Court said:

"It is true that he (plaintiff) does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman and every slip was fatal. * * * A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed * * *. If that is so, there is a contract.

"The implication of a promise here finds support in many circumstances. The defendant gave an *exclusive* privilege. * * *

"We are not to suppose that one party was to be placed at the mercy of the other. * * * But the terms of the defendant's compensation are even more significant. Her sole compensation for the grant of an exclusive agency is to be one-half of all the profits resulting from the plaintiff's

efforts. Unless he gave his efforts, she could never get anything."

Plaintiff relies upon Flaherty v. Cary, 1901, 62 App.Div. 116, 70 N.Y.S. 951, 954. That case involved an alleged contract to form a mortgage insurance company. The Court held the contract incomplete:

"The contract was unenforceable for lack of definiteness. We are unable to determine from the contract where or under what laws the company was to be incorporated. * * *

"Nothing is stated as to the amount of capital stock, the number of directors, the scope of the operations of the company, or as to the form or manner in which the assent of stockholders to the plaintiff's employment [as sole general agent] was to be secured. The terms and conditions of the employment of defendants as counsel for the corporation were never agreed upon."

Two other cases are helpful to plaintiff's case. In Royal Bank of Canada v. Williams, 1927, 220 App.Div. 603, 222 N.Y.S. 425, 429, plaintiff agreed that if certain releases were obtained plaintiff would "finance the Canadian Company with such funds as were essential and necessary to carry on its business in a proper manner, and thereby enable the Canadian Company to liquidate its indebtedness to the plaintiff and to the other creditors * * *." This was held too indefinite. The Court said: "In the event of a dispute between the Canadian Company and the plaintiff as to what was a proper manner of carrying on the business, so as to enable the Canadian Company to liquidate its indebtedness, by what measure would the proposed conduct of the business be judged?"

Garcin v. Granville Iron Corp., 1930, 137 Misc. 648, 244 N.Y.S. 145, 148, involved a contract for the financing of a corporation. Concerning an alleged parol agreement to furnish such finances as would be required the Court stated: "* * * it appears to be so vague and uncertain in its terms as to be unenforceable. * * * The agreement does not specify the nature of the advances to be made nor the terms. Was the plaintiff to make loans upon notes

of the corporation, or was he to purchase shares of stock? If it was intended that the financing should assume the form of loans or· the purchase of notes, at what discount were the notes to be taken? When were the loans to be made? What rate of interest should they bear? When would they mature, and what security was to be given? If the financing was to consist of the purchase of stock, what was to be the class of stock, and what were to be its preferences? At what price was it to be purchased? Contracts more definite than this have been held to be void for lack of certainty."

The distinction on which these cases seem to turn is that where there is no question of the contribution of moneys, the Court will not require more definiteness than business standards demand, but that where there is such a question the Court will demand that the terms be spelled out in the contract with some degree of certainty. This view may well represent on the part of the New York courts both an estimate of current business practice and a statement of what is desirable policy. It would seem that the same distinction would hold where moneys are not to be advanced to the new corporation, but where the apparent proposal is to plough back profits into the corporation to establish a substantial enterprise.

While the contract in Manny v. Burke, supra, mentions that defendant is to produce and finance the entertainment, the subject matter of that contract was principally vaudeville entertainment, and the Court may have believed that Burke's financial contribution could be fixed within relatively narrow limits. To the same effect is Stern v. Premier Shirt Co., 1932, 260 N.Y. 201, 183 N.E. 363, which upheld a contract to finance as a separate corporation an established shirt business.

This rule would seem also to explain the result in many of the cases from other jurisdictions which defendant has cited. Cf. Remington-Rand Business Service v. Walter J. Peterson Co., 6 Cir., 1932, 58 F.2d 11.

Applying the rule to the present controversy, the June 5th letter states· only that defendant will "undertake to make all financial arrangements." However, defendant testified that the nature of the financial arrangements to be made had been thoroughly discussed and was well understood by Mason prior to signature. Thus he testified that he had told Mason that "it was a simple matter to finance an independent unit at that time because with a star the type of Mason most any major company in the business would furnish all the capital and the facilities and the distribution for 50 percent of the profits. Sometimes you can do better than that."

And again: "(T)he facilities of the studio would mean we would have access to· their directors sometimes and all the studio· facilities, the cameramen, all the technicians, and all the equipment of the studios,. that in setting up an independent producing· unit of this kind it was necessary to· have only a skeleton organization, practically nothing more than a bookkeeping set-up in our unit."

Although defendant thus sought to. portray the proposed corporation as nothing more than a bookkeeping set-up which would duplicate the budget of the picture maintained by the major studio supplying the funds, it would appear from the June 5th understanding that the parties contemplated a much more ambitious project. ·Defendant's testimony itself indicates that the corporation was to be a substantial undertaking. Thus, according to defendant, during· the negotiations his position on salary was that he would take fifty percent of whatever Mason drew, with Mason to decide what his own would be, Mason finally mentioning $2,000. per week for himself. If· the parties intended to distribute the· profits as they earned them, rather than to· plough them back to create an enterprise of long-term value, they would have made a much more careful estimate of what those· profits would be. Certainly, Mason was not merely guessing as to the corporation's. probable earnings and dividing them up.

· Again, much stress was placed upon the suggestion that the corporation have its own "contract players," that is, actors under contract with it. One might wonder as to· the cost of this feature of the enterprise and

be in doubt as to the sources from which their salaries were to be paid. It seems unlikely that all the contract players would appear in each production that was financed by a major studio. Furthermore, Rose indicated that the overhead expenses of the corporation would aggregate a large sum of money. In this connection he said: "I told him (Mason) that whatever our salaries would be for the year we would set up a salary for Mr. Mason and myself in each production to cover our salaries for the whole year so that we would have ample money for overhead in our independent unit. By that I mean that if we were to draw $200,000 a year between us we would charge $400,000. in each independent picture so that we would have ample to cover our expenses." Again, while Rose testified that the studio providing the funds would also purchase the stories, it would appear, from the wording of the June 5th letter and from other evidence that the corporation also contemplated purchasing its own stories. The most significant statement indicating that the proposed corporation was to be much more than a skeleton is found in the following extract from defendant's cross-examination:

"By the Court: Q. Am I right in assuming under the plan you had here in mind that this corporation which you were to form would have no tangible or physical assets? A. At the beginning it wouldn't, your Honor, but we hoped to build it up.

"Q. You were hoping to get a complete producing outfit of your own? A. Well, it was a producing outfit.

"Q. I mean your own studio, equipment and matters of that kind. A. It wasn't a difficult matter at that time, your Honor, to set up things of this kind with a major company to set up the financing and get distribution.

"Q. I understand that, but what I had in mind is what you had in contemplation with regard to acquiring an operating company. A. Yes, to own stories, properties.

"Q. Yes. A. Eventually a stock company and any assets that were valuable in the picture business."

Also relevant is the fact that the charter of the corporation provided for 20,000 shares, seemingly unnecessary for a skeleton organization.

Thus, in my judgment, the agreement between Mason and Rose was too incomplete to constitute a binding contract because its ultimate purpose was the development of plans that finally would require the use of large sums of money without sufficiently setting forth the details of the organization, operation, and control of the corporation. The problem of whether an agreement is sufficiently definite is a delicate one and it would be difficult to lay down a helpful general rule. The facts of the individual case are of decisive importance. The agreement need not be so definite that all the possibilities that might occur to a party in bad faith are explicitly provided for, but it must be sufficiently complete so that parties in good faith can find in the agreement words that will fairly define their respective duties and liabilities. There is nothing before me which will in any wise make certain what would happen to the corporation in the event of the death of either Mason or Rose or what would be the effect if through physical disability Mason should be unable to devote his talents to the corporation. The acrimony of the present dispute is perhaps some indication that the June 5th agreement does not satisfy the required standard.

For these reasons I have reached the conclusion that Mason should prevail upon his first cause of action and that his second cause of action, together with the defendant's counterclaim, should be dismissed.

Submit findings of fact and conclusions of law.