C. M. KIRTLEY, Trustee of Automatic Washer Company, Debtor in Corporate Reorganization Proceedings, Appellee,

v.

Joseph ABRAMS and Richland Securities, Inc., Appellants,

Sydney L. Albert, John W. Chamberlin and Louis G. Carmick, Defendants.

No. 3, Docket 26089.

United States Court of Appeals Second Circuit.

Argued Nov. 27, 1961.

Decided Jan. 17, 1962.

On Petition for Modification Feb. 13, 1962.

Samuel Gottlieb, Howard Henig, New York City (Murray L. Lewis, Harry Giesow and Seymour S. Howard, New York City, of counsel), for appellants.

Lester Kissel, New York City (Meyer, Kissel, Matz & Seward), New York City (Sydney J. Schwartz and Clayton P. Wood, New York City, of counsel), for appellee.

Before CLARK, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

Defendants, Richland Securities, Inc., a New York corporation, and Joseph Abrams, a citizen of New York and its dominant stockholder, appeal from a judgment of Chief Judge Bruchhausen in the District Court for the Eastern District of New York, after a trial without a jury. The action was brought against them, and others not served, by C. M. Kirtley, a citizen of Iowa, who had been appointed trustee of Automatic Washer Company in a proceeding for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in the Southern District of Iowa. Jurisdiction was rested on diversity of citizenship. The action stemmed from a writing which we quote in the margin,[1] the subsequent issuance of 50,000 shares of Automatic to Richland thereunder, and the non-delivery to Automatic of the "presses, production equipment and rubber machinery," hereafter "the rubber machinery," mentioned therein.

The amended complaint set forth six causes of action, several of them repetitious: a conspiracy by Richland, Abrams and other defendants to cause Automatic to issue the 50,000 shares without receipt of any money or property there-

---

1. "December 23, 1955

"Richland Securities Corporation
"Great Neck, Long Island
"New York

"Gentlemen:

"This letter will serve to outline the agreement had between Richland Securities Corporation (hereinafter referred to as Richland) and the undersigned Automatic Washer Company (hereinafter referred to as Automatic).

"Automatic agrees to issue and deliver to Richland 50,000 shares of its $1.50 par value common stock in exchange for $300,000 worth of presses, production equipment and rubber machinery. You have represented that you have a quantity of such machinery and equipment stored at Akron, Ohio and you have agreed that we will be allowed to select the presses, production equipment and rubber machinery we deem useful for our purposes, it being understood that the value of the quipment so selected by us will be not less than $300,000.

"If this correctly sets forth the understanding had between us, kindly sign the enclosed copy of this letter on the line marked 'Accepted'.

    "Very truly yours,
    "AUTOMATIC WASHER COMPANY
    "By: JOHN W. CHAMBERLIN
            President
"ACCEPTED:
"RICHLAND SECURITIES CORPORATION
"By: JOSEPH ABRAMS
        "President"

for; knowingly false representation by Richland and Abrams of an intention to furnish the rubber machinery; breach by Richland of its contract to deliver the rubber machinery; wrongful taking possession of the 50,000 shares by Richland and Abrams and conversion of the proceeds; obtaining of the 50,000 shares by Richland and Abrams through fraudulent misrepresentation of intention to deliver the rubber machinery; and Abrams' causing Richland to enter into the contract and then to fail to perform it. In the first, second and fourth causes of action Kirtley sought to recover the fair value of the 50,000 shares as of the time of their issue, alleged to be $400,000; in the third and sixth he claimed damages of $300,000 on the contract. The fifth cause of action asserted that the stock had a value when issued "of at least $400,000" and apparently was the basis for the prayer that a trust be impressed upon the proceeds of sale of the shares by Richland and Abrams. The court found that Kirtley had established all causes of action in the complaint, awarded judgment against Richland and Abrams for $425,000 with interest from March 1, 1956, and impressed a trust upon $154,000 the proceeds of the 50,000 shares, which Abrams was directed to pay into court.

██ The defense was presented in such a confused and diffuse fashion, partially excused by a torrent of objections to rather patently proper questions, that we can readily comprehend the trial judge's failure to perceive its true thrust. This was that everyone had known from the outset that Richland neither could nor would deliver rubber machinery, and that Automatic was to look for the machinery solely to Sydney L. Albert or one of his family of corporate enterprises.[2]

Early in 1955, Albert had acquired control of Bellanca Aircraft Corporation, then a small manufacturer of aircraft parts having the asset of a listing on the American Stock Exchange, by transferring the property of L. Albert & Son, a family firm engaged in the rebuilding and sale of used rubber mill machinery, in exchange for a large amount of Bellanca stock. He embarked Bellanca on a program of acquiring interests in other companies. Abrams was a "finder," who brought Albert propositions from time to time. One such proposition resulted in an agreement for the purchase, in December, 1955, of 330,000 shares of Automatic Washer, at $2.55 per share, by Pierce Governor Company, Incorporated, in which Albert had a controlling interest.[3]

Bellanca owned 97% of the stock of N. O. Nelson Company, a heating and plumbing supply firm which it had acquired for some $4,850,000 in March, 1955.[4] Perhaps as a sequel to the Pierce transaction, Abrams, along with one Shindler, who, according to Abrams, had been "standing by" with him to supply the needed funds to Automatic Washer if the Pierce transaction had not closed, found for Albert another proposition involving Automatic Washer, this time in connection with Bellanca's Nelson stock. This proposition, which was ultimately

2. An outline of some of Albert's activities at the time can be found in Bellanca Corporation, 38 SEC 405 (1958).

3. Abrams testified that, prior to the Pierce contract, Automatic Washer had 292,594 shares outstanding, Tr. 716. It is not clear whether this reflects the issuance, also in December, 1955, of 228,000 shares for the assets of Washer-Dryer Corporation; Chamberlin, who became president of Automatic, received 180,572 of these shares, of which he turned 25,000 over to Purcell and another 25,000 to Hayutin, mentioned below. Neither is it clear whether Pierce acquired all the 330,000 shares; according to the Trustee's report, they were initially issued to Richland, which sold 230,000 to Pierce. In December, 1955, options for Automatic Washer shares were issued to Chamberlin, Purcell and Hayutin.

4. We learn from the SEC's report, 38 SEC at 408–409, that Abrams had guaranteed a loan made by Bellanca to finance this purchase, to the extent of $500,000, until the loan was reduced by $2,000,000, Albert indemnifying him against loss.

embodied in an agreement between Bellanca and Automatic Washer, dated December 23, 1955, as was the contract in suit, "subject to the approval of the respective Boards of Directors of the parties hereto," provided that Automatic would purchase the Nelson stock from Bellanca for 950,000 shares of Automatic stock and the surrender to Bellanca of a $1,525,000 note of Bellanca in favor of Albert which Automatic Washer was simultaneously acquiring from him.[5]

Defendants asserted that the initial understanding was that Bellanca should receive 1,000,000 shares of Automatic rather than 950,000 and that Abrams and Shindler claimed a finders' commission of 10%, to wit, 100,000 shares, which, under usual practice, would be paid by Bellanca, the seller. Albert testified that "I objected strenuously to paying any commission at that percentage, as it was in my knowledge unheard of to pay more than five per cent"; that accordingly "the deal appeared to be stymied"; that, because the market price of Automatic had risen, "I felt that I could readily reduce the selling price from the one million shares to 950,000 shares giving my company, Bellanca Aircraft, the equivalent or more dollarwise and pay the maximum broker-

age that I felt I could pay, namely fifty thousand shares on a 950,000 selling price"; and that "the balance of the fifty thousand shares would remain with Automatic Washer, which I could assume they could in turn pay as their commission to Richland or whoever the brokers may have been." Although this testimony was not disputed, it still left the question why the 50,000 shares thus "remaining" with Automatic Washer to be paid as commission were not issued as such. Defendants' explanation was that Abrams told Chamberlin, the president of Automatic, that, due to the rise in the price of Automatic stock, he "was very worried" about getting 50,000 shares which would be taxed as ordinary income, with only a $1,000 deduction if the shares were thereafter sold at a loss, and that "Mr. Chamberlin suggested that rubber machinery which was to be supplied, which he stated was being supplied by Sydney Albert, could be the basis upon which I could receive the 50,000 shares of stock, and suggested that some written agreement be made so that he could substantiate the issuance of the 50,000 shares for machinery and equipment, provided I would not receive the 50,000 shares on a subsequent date as commission." Shindler, who received 50,000 shares as commission from Bel-

---

5. For this note, executed by Albert on behalf of Bellanca purportedly to reimburse himself for loans in connection with the acquisition of the Nelson stock, Automatic was to issue 305,000 shares to Albert. Kahn, Albert's lawyer, pointed out, in a letter dated February 20, 1956, that the outstanding balance on the note was only $1,220,000; later it was said that the balance was only $915,000. However, no reduction was made in the consideration to Albert from Automatic. Before the closing of the Bellanca-Automatic transaction on April 6, 1956, the number of Automatic shares to be issued for the Nelson stock was reduced by 262,500, but Bellanca was to receive that same number of shares in exchange for 100,000 shares of its own. For reasons developed below, defendants should have been allowed fully to explore all these backings and fillings in support of their contention that the transactions were not at arm's length, but were shifted around to meet

the convenience of Albert, Abrams, Chamberlin, et al.

It is also to be noted that Automatic's purchase of the Nelson shares, which Bellanca had bought for $4,850,000, was after the declaration of a $3,600,000 dividend by Nelson. On the valuation of $8.50 per share which the judge found for the Automatic shares here in suit, the total value of the 1,255,000 Automatic shares to be issued for the ex-dividend Nelson shares would have been $10,667,500.

Litigation between the Trustee of Automatic Washer and Albert relating to the 305,000 shares was settled by Albert's payment of $15,000; the Trustee entered into a covenant not to sue Albert with respect to the claim asserted on that action "or otherwise arising out of or in connection with any purchase, sale or transfer of Automatic Washer Company stock."

lanca, told the same story, adding that Chamberlin said "he had a need for machinery, lots of rubber machinery" whereas Albert "had tremendous quantities of rubbery machinery," and that Albert "stated that he would be more than happy to give the Automatic Washer Company all the machinery that they needed regardless of the amount because he was in control of that company."

■ Whatever the veracity of this and other evidence we have not stopped to summarize, it created an issue that defendants should have been given latitude to develop—just as plaintiff was properly permitted to rebut defendants' story by evidence that the rubber machinery was never delivered by anyone. It is altogether plain that as to the causes of action claiming fraudulent misrepresentation, on which the court based its award of damages, it was essential to determine whether Automatic, henceforth to be controlled by Albert in a degree defendants were never allowed to prove, ever expected Richland to make good on the representations and agreements contained in the writing of December 23, 1955. "The essential element of fraud that must exist in any case properly brought within that designation is a mistake of one party as to a material fact, wrongfully induced by

the other in order that it might be acted upon * * *," 5 Williston, Contracts (rev. ed. 1937), p. 4153; see also 1 Harper and James, The Law of Torts (1956), p. 584. We know of no authority that embodiment of a misrepresentation in a purported contract relieves a plaintiff suing on a theory of fraud from these requirements, and we see no possible reason for any such extension of the "parol evidence rule."

■ Indeed, even as to the third and sixth causes of action, which were on the contract, that rule did not preclude defendants from attempting to show that there never was any agreement such as the writing purported to be. The basic distinction, in New York [6] as in many other jurisdictions, is, as stated a century ago by Mr. Justice Erle in Pym v. Campbell, El. & Bl. 370, 374, 119 Eng.Rep. 903, 905 (1856), "that evidence to vary the terms of an agreement in writing is not admissible, but evidence to shew that there is not an agreement at all is admissible." Grierson v. Mason, 60 N.Y. 394, 397 (1875); Thomas v. Scutt, 127 N.Y. 133, 137–138, 27 N.E. 961, 962 (1891); Smith v. Dotterweich, 200 N.Y. 299, 305, 93 N.E. 985, 987, 33 L.R.A.,N.S., 892 (1911); Saltzman v. Barson, 239 N.Y. 332, 146 N.E. 618 (1925); Bernstein v. Kritzer, 253 N.Y. 410, 171 N.E. 690 (1930); New

6. A New York court would first have to consult the New York conflict of laws to determine what state's contract law applies. The law governing application of the parol evidence rule is the same as that chosen to determine the validity of the contract. American Law Institute, Restatement of the Law Second, Conflict of Laws, Tentative Draft No. 6, § 346, comment d. Applying the principle of Auten v. Auten, 308 N.Y. 155, 124 N.E. 2d 99, 50 A.L.R.2d 246 (1954), New York would select itself as the state having the most significant contacts on that issue. Although Automatic is a Delaware corporation with its manufacturing plant in Iowa, it maintained an office in New York, where Chamberlin, its president, spent most of his time, and held special board meetings in New York, including the meeting that acted on the contract here in suit. Richland is a New York

corporation and Abrams a citizen of New York. The negotiations leading up to the Bellanca-Automatic transaction took place in New York, and the writing dated December 23, 1955, was prepared by Francis J. Purcell, a New York lawyer, in a New York law office, where Abrams and representatives of Automatic and Bellanca were present, and was signed there. These contacts are more significant than those of Ohio, where the rubber machinery was, or of Iowa, where, arguably, it was to be sent. All this is especially so when the issue is whether Richland made any contract as to rubber machinery at all.

If Federal jurisdiction were rested on § 23, sub. b, of the Bankruptcy Act, 11 U.S.C.A. § 46, sub. b, the analysis would be the same, Harris v. Standard Accident and Insurance Co., 297 F.2d 627, 630 fn. 4 (2 Cir. 1961).

York Trust Co. v. Island Oil & Transport Corp., 34 F.2d 655 (2 Cir. 1929); In re H. Hicks & Son, Inc., 82 F.2d 277 (2 Cir. 1936); Zell v. American Seating Co., 138 F.2d 641 (2 Cir. 1943), rev'd, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552 (1944); [7] Kind v. Clark, 161 F.2d 36, 46 (2 Cir.), cert. denied, 332 U.S. 808, 68 S.Ct. 107, 92 L.Ed. 385 (1947). The only respect in which the instant case differs from most of those cited is that Richland does not deny that *any* contract existed; it admits it was to get 50,000 shares but says the consideration for them was not its agreement to furnish rubbery machinery but the services rendered as "finder" and the promise not to assert any further claim for such services against either party to the Bellanca-Automatic deal. Still, it may be argued, Richland would thus be seeking "to vary the terms" of the agreement, which expressly stated that the stock was to be issued "in exchange for" the rubber machinery. This would be reading Mr. Justice Erle's language too literally. The case is not like one where Richland would seek to show that it needed to supply only $250,000 worth of machinery instead of $300,000, or that it was entitled to some relief because the machinery had gone up in price or the stock down—here its claim is that the whole rubber machinery business was a sham, intended to deceive the tax authorities and perhaps to improve Automatic's balance sheet, but not supposed by anyone to give rise to any obligation on its part. As said by Judge Learned Hand in the Hicks case, supra, 82 F.2d at 279, the parties' "actual understanding may always be shown except in so far as expressly or implicitly they have agreed that the writing alone shall control. * * * [T]hey will not be bound if they agree that their words, however coercive in form, shall not bind them." See the useful discussion in 3 Corbin, Contracts (1960 ed.), § 577, and § 572B, "Some Tentative Working Rules of Substantive Law," items 8 and 9.

Although the trial judge did receive a good deal of evidence in support of defendants' theory, he improperly circumscribed their proof. It was important for the defendants to show fully their version of how the transaction developed, and particularly, in view of the judge's proper skepticism as to the credibility of Abrams (who at the time of the trial was serving a prison sentence for a different transaction, United States v. Fabric Garment Co., Inc., 262 F.2d 631 (2 Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959), had previously pleaded guilty to filing a false income tax return for 1952, and, on his own theory of the instant case, had filed and caused Richland to file false ones for 1956),[8] to buttress the testimony of Abrams, Shindler and Albert with that of outside witnesses. One such was Kahn, a Trenton, N. J., attorney, who had been representing Albert and Bellanca. Defendants sought to examine him and to introduce in evidence correspondence between him and Albert, in February and March, 1956, so much of which was sent to Abrams or brought to his attention that none of it could be regarded as confidential and therefore

7. Although the authority of the learned opinion of Judge Frank, for Judges L. Hand, Swan and himself, is shaken on the particular facts by the Supreme Court reversal, in which four Justices thought that "proof of the contract alleged in respondent's affidavits on the motion for summary judgment is precluded by the applicable state parol evidence rule," Michigan's, and only two Justices clearly approved this court's contrary ruling, the other three apparently not reaching the question, the case is distinguishable from the instant one. Zell was attempting to enforce an alleged agreement for compensation additional to that provided in the writing; Richland says the true agreement was altogether different from the writing and that the latter was mere window-dressing. Cf. Grierson v. Mason, 60 N.Y. 394 (1875).

8. Abrams' tax return showed a purchase of machinery for $10,000 and a sale to Richland for $127,500; Richland's showed a purchase of machinery for $127,500 and a sale for stock which produced $154,000.

privileged in the absence of appropriate proof as to some particular item; the examination of Kahn was seriously curtailed and the letters were excluded. These were admissible for a variety of purposes—as tending to show that the Bellanca-Automatic deal, in Kahn's words, "is probably not an arms length transaction," to substantiate defendants' claim that the arrangements were considered fluid long after December 23, 1955, and to corroborate defendants' contention that the 50,000 shares were to be issued "as a commission or a gratuity or whatever else we desire to label it" and that the rubber machinery was to be Albert's, not Richland's. Another such witness was Purcell. The "rubber machinery" agreement was prepared by him as attorney for Automatic, allegedly in the course of a conference concerning the Bellanca-Automatic transaction on December 23, 1955, attended by Albert, Abrams, Chamberlin, Shindler, and Hayutin, and its relationship to earlier drafts of the Bellanca-Automatic agreement and to later developments was of crucial importance. Yet his testimony that Chamberlin had told him in January, 1956, that the rubber machinery had been selected and ticketed, was stricken as irrelevant, and objections to questions as to conversation with Albert about rubber machinery at the conference on December 23 were sustained. Later Purcell was allowed to testify, subject to a motion to strike, as to conversations at the same conference wherein Chamberlin agreed he could use rubber machinery and Albert said "there would be no difficulty substantiating a price of —a value of three hundred thousand dollars"—apparently without any indication that anyone was to pay Albert for it.[9] However, at the end of the case the judge struck this testimony as immaterial. Purcell was also prevented from testifying as to an earlier draft agreement providing a consideration of 1,000,000 shares for Bellanca's Nelson stock. The ruling to strike at the end of the case also carried with it the testimony of Hayutin as to a January, 1956, telephone call by Albert in the presence of Chamberlin, Shindler, Abrams and Purcell, wherein Albert "set up some type of an appointment" with his Akron office "so that Mr. Chamberlin and some of his people would go down and select the machinery that was discussed by Mr. Albert and Mr. Chamberlin at that meeting." The ruling that testimony of such probative value as Purcell's and Hayutin's was immaterial shows that the judgment was not based merely on disbelief in Abrams' testimony but upon a view, which we hold erroneous, that the entire defense was without basis in law. Whether it had a basis in fact is quite another matter.

We need not discuss other contentions of appellants, save to indicate that on the retrial much greater freedom should be allowed in the introduction of evidence of the true value of the 50,000 shares, if that issue should be reached.

The judgment is reversed and a new trial ordered. The provision directing the payment of $154,000 into Court shall remain in effect pending the outcome of the new trial; this intimates no view on our part as to the proper result.

## On Petition for Modification

Counsel for appellants has questioned our power to order that the provision of the judgment directing payment of $154,-000 into court shall remain in effect pending the outcome of a new trial, and also has called our attention to the fact that another panel, on November 9, 1961, had stayed a proceeding in the District Court to punish appellant Abrams for contempt for failure to make the said pay-

---

9. In view of the letter of Purcell's firm dated Feb. 10, 1956, giving its opinion that the 50,000 shares would be validly issued to Richland "in exchange for $300,000 worth of presses, production equipment and rubber machinery * * *," Purcell was scarcely disposed to strength-en defendants' contention that everyone knew Richland was not going to supply the machinery and that the "agreement" was in fact as unreal as it appears to be; the need for giving the defendants full latitude to examine him as a hostile witness was thus all the greater.

**348**

ment on condition that a $50,000 appeal bond be posted. Appellee's counsel contends that our order is soundly rested on F.R.Civ.Proc. 62(g), 28 U.S.C.A. and raises questions relating to amounts collected by appellee on execution against bank deposits and as to a lien perfected against a residence owned by Abrams and his wife.

■ F.R.Civ.Proc. 62(g) is without bearing. However, it is established that, on reversing a plaintiff's judgment for a new trial, an appellate court is not bound to order restitution of amounts collected, when the plaintiff may ultimately recover and such restitution may prevent his then obtaining satisfaction; in such cases moneys that have been collected may be ordered to be paid into court to await a new trial, 5B C.J.S. Appeal & Error § 1949, at p. 510; American Law Institute, Restatement of Restitution § 74, comments b, c; 3 Am.Jur. Appeal and Error § 1243; 2 Freeman, Judgments (1925) § 1171, at p. 2427; Marvin v. Brewster Iron Mining Co., 56 N.Y. 671 (1874); Britton v. Phillips, 24 How.Prac. 111 (N.Y.Sup.Ct. 1862); Young v. Brush, 28 N.Y. 667, 675 fn. 1 (1864). See Finkelstein, The Case of the Recalcitrant Debtor: A Study in Creditors' Rights, 30 St. John's L.Rev. 200 (1956), and Lader v. 128 West 48th St. Holding Corp., 125 N.Y.L.J. 898, col. 5 (Sup.Ct. March 13, 1951), quoted in 30 St. John's L.Rev. at 208–209. Compare Goltra v. Weeks, 271 U.S. 536, 550, 46 S.Ct. 613, 70 L.Ed. 1074 (1926) and United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

In the light of the circumstances and the authorities, we believe the proper disposition to be as follows:

(1) Appellee shall deposit with the Clerk of the District Court all amounts that he has collected under his judgment, to abide the event of a new trial;

(2) The lien of the judgment previously rendered shall remain in effect, but no further executions shall be levied thereon;

(3) The direction for the payment of $154,000 (reduced by the amounts already collected by the appellee) into court shall remain in effect, except that it shall be stayed if appellants post a bond or other security in the amount of $50,000 to secure the payment of any judgment that may be rendered on a new trial.

Our previous order is modified to that extent.