HORACE LAVALLEUR and L. L. LAVALLEUR, Appellants, v. J. H. HAHN, Appellee.

**Evidence:** VARIANCE OF CONTRACTS BY PAROL: EXCEPTIONS TO GENERAL RULE. There are several well settled exceptions to the rule that parol evidence is not admissible to contradict or vary the terms of a writing, in an action between the parties thereto or their privies, among which are the following: 1st, it may always be shown that the instrument was procured by fraud or duress and therefore never had any legal force; 2d, to exclude parol evidence of an agreement because of a writing it must be shown that a subsisting written agreement between the parties exists; 3d, it may be shown by parol that a writing, complete in form and delivered, was not to become binding until the performance of some condition resting in parol; 4th, it is permissible to show by parol that a written instrument apparently transferring absolute title to property was intended only as security.

**Same:** FRAUD IN THE SALE OF LAND: PAROL EVIDENCE. It is competent to show by parol that a contract for the sale of land at a certain price was entered into pursuant to the oral understanding and agreement that defendant, in an action for fraud and deceit, was not the owner, and that plaintiff desiring to purchase the land employed defendant as his agent to buy the same at the lowest possible price for his benefit, that defendant in fact purchased it for less than the price specified in the written contract, not only concealing that fact from plaintiff but representing that he was compelled to pay the full contract price, and that to fur-

ther conceal the fraud he procured a conveyance from the owner to himself and partner who transferred the land to plaintiff. And upon proof of such a state of facts plaintiff was entitled to recover the profits thus arising to defendant.

*Appeal from Jasper District Court.*—HON. BYRON W. PRESTON, Judge.

FRIDAY, OCTOBER 20, 1911.

ACTION to recover a sum of money secured by defendant from plaintiffs through fraud and deceit. Defendant's defense was a general denial. At the conclusion of the testimony, the trial court directed a verdict for defendant, and plaintiffs appeal.—*Reversed.*

*Mowry & Cross,* for appellants.

*Tripp & Tripp* and *E. J. Salmon,* for appellee.

DEEMER, J.—Plaintiffs are residents of Jasper county, Iowa, and defendant is a resident of the same county, and in the year 1907 was engaged in the real estate business at the town of Colfax. One L. E. Zachary, at that time a resident of Colorado, living at the city of Pueblo, owned three hundred and twenty acres of land in Jasper county, Iowa, which plaintiffs were desirious of purchasing, and they employed defendant to purchase the same for them from Zachary. Defendant was in partnership with one Stouffer, and it seems that on the 21st day of September, 1907, this partnership, in the name of Hahn & Stouffer, entered into a written contract with Zachary and wife for the purchase of the three hundred and twenty acres of land at the agreed price of $24,000. This contract was entered into pursuant to correspondence had between Zachary and defendant during the latter part of August and the 1st of September of the year 1907. At the time of the pur-

chase, defendant represented to Zachary that he was buying the land for other parties, who lived in Kansas, but that for convenience the land was to be conveyed to him. By the terms of the contract, Zachary was to deed the land before March 10, 1908, but, as a matter of fact, the deed was made by Zachary and wife to J. H. Hahn and H. G. Stouffer on October 3, 1907, although not delivered perhaps until a later date, and recorded March 30, 1908. Defendant stated at the time the deed was made that he was buying the land for someone else, that the conveyance should run to him and his partner, and that they would convey the land to the purchaser. The testimony shows that on the 19th day of September, 1907, one of the plaintiffs called upon defendant at his office in Colfax, to ascertain whether he (defendant) could buy the land for the plaintiffs. After some negotiations, defendant undertook to purchase the land, and the following is some of the testimony with reference to this agreement:

I said to him (Mr. Hahn), 'You go and buy that land as cheap as you can, and make as good terms as you can,' but that we would pay $80 an acre, but that he should buy it as cheap as he could, and make the terms as good as he could make them; and he said, 'All right, I will do it; I will go out and see Mr. Zachary; I will make the terms as good for you boys as I can.' He said, 'I want to get away today; this is Friday, and I want to get back Sunday.' He said, 'You get your draft for a thousand dollars at once.' There was nothing said about a contract up to that time. After I got the $1,000 draft, it was along late in the evening, along about 6 o'clock, and after he had receipted for the $1,000 he said, 'Boys, I ought to have a contract for this farm.' I said, 'All right.' Then we made the contract. After the contract was made, he said, 'Boys, if I do not buy this for $80 an acre, you will not hold me to the contract?' I said, 'Certainly not,' and replied, 'If you can buy it for less, you will buy it for less?' He said, 'Certainly.' That statement was made after the written contract was made. Exhibit B, Robinson, is the contract that was executed at

that time. Mr. Hahn went to Pueblo, Colo. I saw him start. We had a conversation with him after he returned from Colorado in regard to this matter, in Colfax, on the following Monday, the 22d or 23d. I said to him, 'What do you want of me?' and he said he had bought it. I ask him how, and he said at $80 an acre; that he had stayed there until 2 o'clock at night, and that was the best he could do. He further said that there would have to be a change made in the contract; that he would have to pay a thousand dollars more down, and that the rate of interest would be raised; that if we would make it an all cash payment before a certain time we would be allowed $300 off. Another contract was drawn at that time. Mr. Hahn drew it. Exhibit C, Robinson, is the contract that was drawn and signed on the 23d day of September, 1907, by myself and Mr. Hahn. I believed at that time the statements made to me by Mr. Hahn, to the effect that he had been obliged to pay $80 an acre for the land, and relied on them; if I had known his statements to be false, and had known that he had agreed to pay only $75 an acre for the land, I would not have entered into the second contract. Deeds were afterwards made for the land. The consideration paid for the land was $25,600, or $80 an acre. The money was paid as follows: $2,000 to Hahn; $1,000 for possession paid to Cross and myself; $2,880 for two notes (they were the rent notes that we had given to Mr. Zachary, and he had sold them to the Valley National Bank of Des Moines, Iowa); $530 to Meredith & Son; there was $3,300 and some odd dollars that was adjusted through Hahn; then there was $13,500 Allfree mortgage on this land, and that brought it down to $3,300 and some odd dollars; I do not remember just how much. We (Ed Cross and myself) had the place rented, and had given our notes for three years. I had put something like $375 of improvements on the place, and Ed Cross had put something like $200 worth of improvements on the farm, and of course we could not let the place go for nothing. The $1,000 was paid to cover these improvements. The $530 paid to Meredith & Son was for a mortgage on the place. The $13,500 to Allfree was a mortgage we put on the place; that was so we could pay cash for the place, and we put a mortgage of $13,500.

The money we.received on that mortgage was paid to Mr. Hahn, and as a matter of fact he received that money. There was $105 of taxes paid, and a mortgage of $2,732.64 to the Security Loan & Trust Company of Des Moines, Iowa. As a matter of fact, we paid $25,600 for the premises, less $1,000 allowed us for possession. Exhibit D, Robinson, is in the handwriting of Mr. Hahn, and it represents the settlement for the farm between Mr. Hahn, L. L. Lavalleur, and myself. I did not know at the time of the settlement for the farm that Hahn had purchased the farm for less than $80 an acre. He had told me that he paid $80 an acre. The first that I had learned that he had purchased the land for less than $80 was probably along in April, 1908. I suspicioned there was something wrong when we were making settlement. I could not get anything out of Hahn. The date of the settlement and the date of the memorandum was, I think, March 9, 1908.

Another witness by the name of Cross testified as follows:

I was with Horace Lavalleur at the office of J. H. Hahn, in Colfax, on the 19th day of September, 1907, and heard some of the conversation between Lavalleur and Hahn at that time, with reference to the land in controversy. . . . Mr. Hahn said that he would go out and buy the land as cheap as he could. He said he would go out that evening, and wanted a thousand dollars to take with him to make the purchase. He said, 'I will go out and work in your interest · (Horace and L. L. Lavalleur's), and I will buy the land as cheap as I can, and make as good terms as I can.' He said, 'Of course, I will buy it in Mr. Stouffer's. and my name, so Mr. Zachary won't know I am getting the land for you, as he might not allow the $1,000 for giving possession.' Exhibit B, Robinson, was signed by the parties at that time. When that was signed, Mr. Hahn said, 'Now, if I do not buy the land for you boys, you will not hold me to this contract? and they said, 'Certainly not;' that they would not do that. Nothing that I remember was said by Mr. Hahn that he would not hold Lavalleur to the contract in case he could buy the land for less than $80 an acre. This took place after the contract was signed. The statement

of Mr. Hahn that he would buy the land as cheaply as possible took place at the same time as the other conversation. It was at the time they gave him the $1,000 draft, the same day.

The other plaintiff testified:

I was present in his office in Colfax, Iowa, on the 19th day of September, 1907, and took part in the conversation. . . . Mr. Hahn said, 'I will go out and try to buy this land for you boys as cheap as I can. If I can not buy the farm for less than $80 an acre, then you will give $80?' We said that was all right, and we went over to the bank to get a draft for $1,000. He said, 'Boys, I will go out and work in your interests, and buy the land for you as cheap as I can; if I can buy the land for less than $80, I will do it; but if I can not, I will give $80.' We said that was all right, and for him to buy it as cheap as he could, and he said he would do it. This conversation was after the signing of the contract (Exhibit B, Robinson). Of course, it had been talked before the contract was signed, and afterwards, too. Hahn said, 'Boys, I will go out and work in your interests; if I can not get the land for $80 an acre, you will not hold me to this?' and we told him, 'No.' Mr. Hahn said that he was going to see L. E. Zachary in Colorado about the purchase of the land. I saw Mr. Hahn after he returned from Colorado, at my residence in Ira, Iowa. Horace Lavalleur was with him. They drove into my place. I was out in the field somewhere, and they called me, and I went where they were. Hahn said, 'Well, I got the farm.' I said, 'Did you?' and he said, 'I got it all right, but I have got to have a little more money.' I asked him how much, and he said he would have to have another $1,000. We talked awhile, and he read over another contract. I supposed it would be all right, and we went to Ira and got a thousand dollars at the bank, and my brother and I signed the other contract, and they went home. He said that he had to pay $80 an acre for the land; that he worked there until 2 o'clock at night with Zachary and his wife, before he could get them to sign a contract. He said that he had worked and done everything he could, but he could not get them to sign a contract for less than

$80. He said that Zachary had to have more money; that he needed some more money right at present, and that we could not have thirty days, but would have to have it in a shorter time, and that we would have to pay six percent interest, when it should have been five and one-half. I was not present when the settlement was made, only the $2,000 payment. The other settlement was made by my brother. They could not get the papers straightened out, and some of it is not yet settled. The title to the farm is not yet cleared up. Conveyances of the land were made to Horace Lavalleur and myself. The consideration paid for the land was $25,600, at the rate of $80 an acre. At the time Mr. Hahn and Horace Lavalleur called at my place in Ira, after the return of Hahn from Colorado, I did not know how much he had agreed to pay Mr. Zachary for the place. Nothing more than what he said. He said he had to give $80 an acre. I believed and relied upon his statements. If I had known his statements to be false, and, as a matter of fact, he had agreed to pay but $75 an acre, I would not have entered into the second contract.

In addition to the testimony first quoted, Horace Lavalleur testified as follows:

The defendant, J. H. Hahn, received $170 as compensation for acting as our agent in the purchase of the Zachary land. He figured it out. Do not know that I can explain how he figured it out, but he set down the figures, showing how it was done. We were to get $300 off if we made it a cash payment, and $170 of that was not allowed. He said he was out there and made those trips, and that he was entitled to $170. He said he had to pay his fare both ways and his expenses. He said he was keeping out the $170 to pay his bills. Mr. Stouffer was not present when this talk was had in regard to this matter between Mr. Hahn and myself. I had a talk with Mr. Stouffer about buying the farm. Mr. Stouffer was out there at the time. He was not present when the contracts were made. Mr. Stouffer is the first man I spoke to about the sale of the land. The settlement I finally made was not made until after Mr. Hahn returned from Pueblo. I think he went out there (Pueblo) on the 21st day of

September, and I think this settlement was made on the 9th day of March, afterwards. It was at the final settlement, on the 9th day of March of the year following, that I had the talk with Mr. Hahn about the $170. I asked Mr. Hahn what was going to him. He commenced to figure up. I wrote him a check when he was done figuring it up for what it amounted to. I gave him a check for $3,351.50. That is just the amount that Exhibit D shows.

So far as material, the first contract referred to by these witnesses, of date September 19, 1907, reads as follows:

This agreement made and entered into this 19th day of September, A. D. 1907, by and between J. H. Hahn, party of the first part, and Horace and L. L. Lavalleur, parties of the second part, witnesseth: That the party of the first part has this day bargained and sold to the party of the second part the three hundred and twenty acres of land known as the L. E. Zachary farm, being now occupied by Horace Lavalleur and E. A. Cross and described more particularly as follows: (Here follows description of land), for the consideration of twenty-five thousand six hundred and 00-100 dollars ($25,600.00) upon the following terms and conditions: Ten hundred and 00-100 dollars ($1,000.00) cash, the receipt of which is hereby acknowledged. Ten hundred and 00-100 dollars ($1,000.00) October 1, 1907. Eighty hundred and 00-100 dollars ($8,000.00) on or before March 10, 1908. Ten hundred and 00-100 dollars, being the amount expended for improvements and surrender of possession of said place on March 1, 1908, and which amount is to be credited as part of the purchase price of said land. The said improvements to remain upon the said place, and the parties of the second part agree to pay the two notes of $1,440.00 each, making $2,880.00, which are due January 1, 1909, and January 1, 1910, being the rent notes of the said place for the seasons of 1908 and 1909 and which are now sold to the Valley National Bank of Des Moines, Iowa, the same to be credited as part of the above purchase price of said place. The parties of the second part further agree to pay the mortgages of $2,500.00 and $500.00 now upon the said place, the same to be deducted from the

purchase price as above, and to execute in favor of L. E. Zachary real estate mortgage and notes for the sum of eighty-seven hundred twenty and 00-100 dollars ($8,720.-00), dated on March 1, 1908, on or before eight (8) years and bearing five and one-half percent interest, payable annually. It is further agreed by the party of the first part that he will execute a warranty deed and deliver a good abstract of title, pay the interest on the $3,000.00 loans now upon the said place up to March 1, 1908, and the taxes on the said place for the year 1907; and it is further agreed by the party of the first part that he will execute the said warranty deed and deliver the said good abstract of title to the Citizens' State Bank of Colfax, Iowa, not later than January 1, 1908 (unless called for sooner by the party of the first part), to be held by them for the fulfillment of this contract. It is further agreed by the parties of the second part if it is possible for them to arrange matters to lift the said mortgages of $3,000.00 now against the said place and to make a loan sufficient to pay the said amount, together with the sum of $8,720.00 (which sum was to be in a mortgage to L. E. Zachary), that they will execute the new loan and will pay cash in lieu of the mortgage to the said L. E. Zachary, less any expense he may be to in making the said change. (Duly signed by the parties.)

The material parts of the second or substituted contract referred to read:

This agreement made in duplicate this 23d day of September, A. D. 1907, by and between J. H. Hahn, party of the first part, and Horace and L. L. Lavalleur, parties of the second part, witnesseth: That the party of the first part has this day bargained and sold to the parties of the second part the 320 acres of land known as the L. E. Zachary farm, being now occupied by E. A. Cross and Horace Lavalleur, and more particularly described as follows: (Here follows description), for the consideration of twenty-five thousand six hundred and 00-100 dollars ($25,600.00) upon the following terms and conditions: Twenty hundred and 00-100 dollars ($2,000.00), the receipt of which is hereby acknowledged. Ninety hundred and 00-100 dollars ($9,000.00) on or before March 5, 1908. Ten hundred

and 00-100 dollars ($1,000.00), being the amount expended for improvements 'and surrender of possession of said place by Cross & Lavalleur by March 1, 1908, and which amount is to be credited as part of the purchase price of said land. The said improvements to remain upon the said place, and the parties of the second part assume and agree to pay the two rent notes of $1,440.00 each, making $2,880.00, which are due January 1, 1909, and January 1, 1910, being the rent notes for the said place for the seasons of 1908 and 1909, and which are now sold to the Valley National Bank of Des Moines, Iowa, the same to be credited as part of the above purchase price of the said place. The parties of the second part further agree to pay the mortgages of $2,500.00 and $500.00 now upon the said place, the same to be deducted from the purchase price as above and to execute a mortgage back upon the said place for five years at six (6) percent interest, to be for the balance due of $7,720.00. It is further agreed by the party of the first part that he will execute a warranty deed and furnish a good abstract of title and deliver the same to the Citizens' State Bank of Colfax, Iowa, not later than January 1, 1908, or sooner, if called upon to do so by the parties of the second part, if they are ready to close deal before that date. Pay the interest on the loans of $3,000.00 now upon the place up to March 1, 1908, and the taxes for the year 1907; the said delivery to the Citizens' State Bank, being for the purpose of getting the papers in readiness to get the deal closed up as soon as possible. It is further agreed by the party of the first part that if the deal can be closed up and all cash paid (in lieu of the mortgage that was to be executed, together with the cash payments as per contract), that the party of the first part will allow a discount of $300.00 for the same, together with the expense the parties of the second part may be to in canceling mortgages now against the said place. It is further agreed by the parties of the second part that if it is possible for them to arrange matters to lift the said mortgages, amounting to $3,000.00 in all, against the said place and to make a loan sufficient to pay the said amount, together with the sum of $7,720.00 (which sum was to be a mortgage), that they will execute a new loan and will pay cash in lieu of the mortgage which was to be executed. (Duly signed by parties.)

The statement upon which the settlement was made is in the following words and figures:

| | |
|---|---:|
| Cash | $2,000.00 |
| Possession | 1,000.00 |
| Rent Notes | 2,880.00 |
| Security Mortgage | 2,732.64 |
| Meredith | 530.00 |
| Taxes | 105.86 |
| | $9,248.50 |

$25,600.00
 9,248.50

———————

$16,351.50       With commission of $130.00 to
13,000.00             come out of $13,000.00 loan.

———————

$ 3,351.50

The defendant, although a witness on his own behalf, did not·in any way deny the testimony which we have set out, but planted himself squarely upon the contracts just quoted, claiming that all the testimony introduced by plaintiffs was inadmissible, because it tended to vary and contradict the written contracts between the parties. The sole question in the case is the admissibility of the testimony quoted under the issues tendered by the pleadings. The action is to recover damages from the defendant on the theory that he was plaintiffs' agent for the purchase of the farm, and that as such he was bound to the exercise of absolute good faith in the matter. It is charged that he did not carry out his duties as agent, but, on the contrary, sought to profit himself by the transaction, and was guilty of actual fraud and deceit. Defendant's claim, as we understand it, is that, as the written contracts show, he was

1. EVIDENCE: variance of contracts by parol: exceptions to general rule.

not an agent, but a vendor of the land, plaintiffs can not show by parol evidence that he stood in any other relation to them. He especially relies upon the so-called parol evidence rule, and if it be found that the rule does not apply to the issues as tendered by the pleadings, then the trial court was in error in excluding the testimony and in directing a verdict for the defendant. The general rule is that parol evidence is inadmissible to contradict, vary, add to, or substract from the terms of a valid written agreement in an action between the parties thereto or their privies. Elliott on Evidence, section 568. But to this rule there are many exceptions, among them the following:

(1) It may always be shown that the document in question never had any legal existence. On this ground rests the very important exception that duress or fraud in the inception of the contract may be proved, although accompanied by the most solemn formalities. Such proof does not recognize the contract as ever existing as a valid agreement, and is received, from the necessity of the case, to show that that which appears to be a contract is not and never was a contract. . . . For the purpose of proving the fraud, verbal statements which are material and fraudulent, although made before or at the same time with the written agreement, may be proved. In such case the rule that prior negotiations are merged in the written agreement does not apply. No rule is better settled than this: Where fraud is alleged, a very broad range is given to the testimony. . . . In such cases any secret agreement or trust may be shown by them, although directly contradicting the face of the conveyances. The consideration may be inquired into, the purpose and object of mortgages or assignments may be shown, and generally the entire transaction may be investigated. Again, in actions upon a written contract, brought by one of the contracting parties against the other, the rule under discussion is constantly invoked; and parties are allowed to prove fraudulent representations or conduct which formed an inducement to the contract. Jones on Evidence (Pocket Ed.), section 435.

(2) "It is a principle, to which we shall frequently

have occasion to allude, that, 'in order to exclude oral evidence of a contract, it must be first established that there is a subsisting written contract between the parties; and, where the immediate issue is whether there is or was a writing covering the contract, it is not competent to exclude oral testimony bearing on that issue upon an assumption of such writing. To do so is to beg· the question.' " Jones on Evidence (Pocket Ed.), section 434; *Brewster v. Reel,* 74 Iowa, 506; 1 Greenleaf on Evidence, section 284. This exception has been shortly stated as follows: Parol evidence is admissible to show that an apparent contract never had a legal existence. Browne on Parol Evidence, section 33. As illustrating the application of the exception, see cases cited under this section.

(3) "Parol evidence is competent to show that a writing, in form a complete contract, and delivered, was not to become binding until the performance of some condition resting in parol." Browne on Parol Evidence, section 32. This exception is very similar to the second one just quoted, and the manner of its application is shown in the cases cited by Mr. Browne under the section quoted.

(4) "It has long been the settled rule that in courts exercising equitable jurisdiction it is admissible to prove by parol that instruments in writing, apparently transferring the absolute title, are in fact only given as security." Jones on Evidence (Pocket Ed.), section 446. "Although evidence to show that an instrument, absolute in form, is not such in fact, is most frequently used to show that an apparent deed is a mortgage, it is not limited to this class of cases. The rule that deeds and other instruments, absolute in terms, can be thus transformed into instruments for the security of money is purely an equitable doctrine; and it has sometimes been held that in actions at law evidence for this purpose is not admissible. But in some states such evidence has been held proper in legal actions, as well as in those of an equitable nature; and, as the differences

between legal and equitable procedure become less marked, there will doubtless be a tendency toward the adoption of the same rule of evidence, both in legal and in equitable proceedings." Jones on Evidence (Pocket Ed.), section 448.

The exceptions are well sustained by authority, and we have heretofore recognized them in many cases. See *Hinsdale v. McCune,* 135 Iowa, 683; *Sutton v. Griebel,* 118 Iowa, 78; *McCaskey v. Hall,* 140 Iowa, 87; *Cavanagh v. Beer Co.,* 136 Iowa, 236; *McNight v. Parsons,* 136 Iowa, 390; *Oakland Cem. v. Lakins,* 126 Iowa, 121; *Bonewell v. Jacobson,* 130 Iowa, 170; *Morrison v. Bryson,* 129 Iowa, 645; *Providence Co. v. Fessler & Sons,* 145 Iowa, 74; *Rohrabacher v. Ware,* 37 Iowa, 85; *Walker v. Camp,* 63 Iowa, 627; *Sutton v. Weber,* 127 Iowa, 361; *Fisher v. Lee,* 94 Iowa, 611.

The exception which permits the introduction of parol evidence where fraud is alleged has been thus formulated: "It has been held that where the execution of the written instrument has been induced by an oral stipulation or agreement made at the time, on the faith of which the party executed the writing, and without which he would not have executed it, but where such agreement or stipulation is omitted from the writing, even if its omission is not due to fraud or mistake, evidence of the oral stipulation or agreement may be given, even though it may have the effect of varying the contract or obligation evidenced by the writing, where there has been an attempt to make a fraudulent use of the instrument in violation of such promise or agreement, or where the circumstances would make the use of the writing for any purpose inconsistent with such agreement dishonest or fraudulent. The rule is put upon the ground that the attempt of one party afterward to take advantage of the omission of such terms from the contract is a fraud on the other party, who was induced to execute it upon the faith of such promise; and hence he will be

permitted to show by parol evidence the truth of the matter." See 17 Cyc. 693, 694, citing many cases.

Going now to the substantive law of the case, it is apparent, if the testimony before quoted is to be believed, that defendant was plaintiffs' agent to purchase the land at the lowest price he could for the benefit of his principals, the plaintiffs herein; that he did make such purchase (that is, bought the land for $75 per acre), but that he concealed that fact from plaintiffs, and represented that he had had to pay $80 therefor; that he settled with plaintiffs on that basis, and conveyed them the land which he had purchased in the name of his firm, although for the plaintiffs, and received their money on the theory that he had paid $80 per acre for it. This under our holdings constituted a fraud upon them, and they are entitled to recover the profits made by defendant in the transaction. *Merrill v. Sax,* 141 Iowa, 394; *Morey v. Laird,* 108 Iowa, 670; *Green v. Peeso,* 92 Iowa, 261; *Rorebeck v. Van Eaton,* 90 Iowa, 82; *Schneider v. Schneider,* 125 Iowa, 1; *Leasure v. Boie,* 142 Iowa, 284.

Now, if to the parol evidence rule there be an exception in the case of fraud, then clearly it was competent for the plaintiffs to show that, instead of purchasing the land from the defendant, Hahn, as the written contracts show he (Hahn) was acting as their agent for the purchase of the lands, and that the contracts were never intended to be binding, or the complete evidence of the transaction, but were being used fraudulently by the defendant to escape a duty owing by him under the law. Where fraud is charged, the court looks behind all forms and at the substance of the transaction, and in such cases no one can shield himself under the parol evidence rule. We think the testimony was admissible under at least two exceptions to the parol evidence rule. The conclusion finds abundant support in *Bonewell v. Jacobson, supra; Rorebeck v. Van Eaton, supra;*

*2. SAME: fraud in the sale of land: parol evidence.*

*Sutton v. Griebel, supra; McCormick Har. Co. v. Morlan,* 121 Iowa, 451; *Esterly v. Eppelsheimer,* 73 Iowa, 260; *Dowagiac v. Gibson,* 73 Iowa, 525.

In *Humbert v. Larson,* 99 Iowa, 275, we said: "Appellant further argues that the court erred in allowing certain evidence, over his objections, tending to contradict the written bill of sale. The record shows that the court below did admit evidence to prove the representations and statements made by plaintiff as an inducement to the sale. Under the issues in the case, this evidence was properly received. The defendants did not rely upon their bill of sale. Their defense was independent of it, and was based upon fraud. It is elementary that the rule excluding evidence contradictory of a written instrument does not apply when fraud is the gravamen of the action or gist of the defense. It is clear that there was no error here."

In *Stanhope v. Swafford,* 80 Iowa, 45, the court said: "It will be observed that the action is to recover for false representations inducing plaintiff to make the trade. Now, if it be assumed that all the terms of the contract are embodied in the writing, and the false representations are not expressed therein, plaintiff may recover thereon, for the reason that the action is not upon the contract, but for false representations—a cause of action other and independent of the contract. If one should be inveigled or induced by false representations to enter into contract of a sale of property, he could maintain his action on the false representations, and would not be required to sue on the contract of sale, in order to recover his damage therefor." See, also, *Nixon v. Carson,* 38 Iowa, 338; *Mann v. Taylor,* 78 Iowa, 355; *Rohrabacher v. Ware,* 37 Iowa, 85.

None of the cases cited or relied upon by appellee seem to be in point. Counsel for appellee throughout the discussion seem to overlook the fact that fraud is the gravaman of plaintiffs' action, and that in such cases the parol evidence rule does not obtain.

For the reasons pointed out, the judgment must be, and it is, *reversed.*