Carl J. Spindler, Appellee, v. Orville W. Krieger, Appellant.

Gen. No. 11,075.

Second District, Second Division.
January 27, 1958.
Released for publication February 13, 1958.

Morgan, Pendarvis & Morgan, of Peoria, for appellant.

Galbraith & Baymiller, of Peoria, for appellee.

JUSTICE SOLFISBURG delivered the opinion of the court.

This is a suit for an accounting to recover alleged secret profits which defendant is charged with having obtained wrongfully while acting as a real estate broker in behalf of plaintiff in the purchase of certain real estate in the city of Peoria. The cause was referred to the Master in Chancery of the Circuit Court of Peoria county. The evidence consisted almost entirely of the testimony of plaintiff and defendant, together with some seventeen writings placed in evidence. The report of the master in chancery found the issues in favor of plaintiff and granted him the relief he sought. On exceptions to that report, the chancellor confirmed and approved the report of the master in chancery. From that decree this appeal is taken by defendant.

Defendant contends that the decree of the chancellor was erroneous for two reasons: First, because there was no agency relationship between plaintiff and de-

fendant, but rather a vendor-vendee relationship; secondly, because under the parol evidence rule it was error to admit extrinsic evidence concerning the transaction and the relationship of the parties in the face of two instruments in writing, a so-called offer to purchase and a subsequent letter signed by both parties.

This suit arose out of the acquisition by plaintiff of a parcel of real estate at the southwest corner of Knoxville and Nebraska Avenues in the city of Peoria. The defendant had been a licensed real estate broker for a number of years and was sole owner of the business known as the Marquette Real Estate Company in Peoria. He advertised extensively and held himself out to the public as being engaged in the business of buying and selling real estate for the public generally. Plaintiff was a substantial investor in Peoria real estate. In the past plaintiff had been represented in real estate transactions by various real estate brokers, including one prior transaction with defendant.

About February 15, 1955, plaintiff initiated discussions with the defendant, Krieger, concerning the purchase by plaintiff of the property in question, plaintiff mistakenly believing that defendant had the property listed for sale. Plaintiff stated to defendant that he would pay not to exceed $35,000 for the property. Defendant testified: "I told him (plaintiff) it was not listed with me but I would find out how he could buy it." Defendant at that time did not know the owners. Subsequently on or about March 6, 1955, the plaintiff again contacted the defendant at the latter's office and advised him that he would only pay up to $32,000 for the property, plus assumption of $400 in special assessments then a lien on the real estate and that that sum would have to include the real estate commission. On that occasion the defendant filled out in longhand a so-called offer to purchase

on a standard form. The offer to purchase, containing most of the usual printed clauses found in such forms, named defendant Orville W. Krieger as seller and plaintiff Carl J. Spindler as purchaser, called for a purchase price of $32,000 with $3,000 as earnest money deposit, but specified no date of possession nor expiration date for the offer to purchase. The instrument was signed by plaintiff but not by defendant, bore no date, and incorrectly referred to the real estate as the "S.W. Corner of Linn & Knoxville Ave., Peoria, Ill.," whereas it was actually at the southwest corner of Nebraska and Knoxville Avenues in that city. At defendant's request plaintiff executed and delivered to defendant a counter check payable to Marquette Real Estate Co. for $3,000 as earnest money, but plaintiff asked defendant to hold the check until he would replace it with his personal check which he did some ten days later. At that time defendant had no listing for the property, had not contacted the owners, and had no connection with them. Sometime between March 15, 1955, and March 25, 1955, defendant Krieger contacted the owners of the premises or their representative, a Mrs. Hartman, in Florida, by telephone. Mrs. Hartman informed Krieger that she did not want to do business on the phone and that there was no sense in his coming down unless he would pay a specified price, variously fixed at $30,000 or $35,000 by defendant's testimony. Defendant thereupon flew to Tampa, Florida, and contacted Mrs. Hartman and her husband relative to purchase of the premises. The first time defendant talked to or called any of the owners of the property in person was three days before he entered into a contract with them for the purchase of the premises in his own name on March 28, 1955. In evidence was a written contract, dated March 28, 1955, wherein defendant agreed to purchase the property from Dorothy T. Hartman and others, for $26,500 with

135

$1,000 down payment and no real estate broker's commission.

On the following day, March 29, 1955, defendant sent a telegram from Tampa, Florida, to plaintiff at Peoria as follows: "Hi Carl: Trip successful after 2 days. Leaving 1st plane out. Weather really nice, Orville." In early April, 1955, defendant summoned plaintiff to his office and told him that he had contacted the owners of the property, at which time he or his secretary had written out a letter for the plaintiff in which plaintiff stated he would pay $32,000 less the $3,000 which he had paid down and would also assume the special assessments. Plaintiff and defendant both signed this letter. Defendant told plaintiff that he had seen "the people" and in response to plaintiff's inquiry, defendant said that with commissions and extras the cost of the property would run plaintiff $32,000. The purpose of the letter, as stated by defendant, was to reconfirm what plaintiff and defendant had originally agreed. "I did not want to buy the property and have him not go through with the deal. I had already bought it for $26,500." On this occasion defendant asked plaintiff how he wanted title taken and both decided not to take it in plaintiff's name, but in defendant's name because on previous occasions defendant had failed to get the property when the seller knew plaintiff was buying it.

On April 27, 1955, defendant, Krieger, took title to the property by deed from the owners and on that day wrote a letter to plaintiff stating, among other things: "We closed our deal today on the Knoxville property. Would like to wait about thirty days now before we sell the property to you. However, this I will leave entirely up to you. I have the two properties on Knoxville to talk to you about when you next come into the office." On May 13, 1955, plaintiff took title to the property by deed from defendant and his wife,

paying him a total price of $32,000 less an amount for tax prorations, by checks made payable to Marquette Real Estate Co. On May 3, 1955, defendant addressed a post card to plaintiff from Chicago reading: "Dear friend Carl—I sure appreciate your letting me paint sign on wall. I ordered it—Here's wot it will say— This entire corner sold by Marquette Real Estate Co.— Proving its the SOLD sign that counts. OWKrieger. —Carl—I had to take insurance on buildings. Took $20,000—Don't want to get short rated—I'd like to bid on your insurance. I represent Michigan Mutual Co. Dividends come back to you each year. ORV." Sometime after plaintiff took title, he received a brief letter from defendant which stated: Friend Carl— Completely forgot to relate to you the interesting details in the acquisition of the Nebraska & Knoxville site for you. Will tell you next time I see you. Really quite unusual. Will be back Wed. or Thurs. Regards. ORV."

After he had taken title, plaintiff learned for the first time that defendant had purchased the property for $26,500. Thereafter, on July 18, 1955, plaintiff's attorney addressed a letter to defendant: "Dear Orville: Carl Spindler has discussed with us the question of accounting in connection with your purchasing for him the property at the corner of Knoxville and Nebraska. If you desire, we shall be glad to discuss this matter with you at your convenience. Yours very truly, Galbraith & Baymiller by Carroll Baymiller." On July 28, 1955, defendant Krieger mailed a picture post card to plaintiff from out of town, reading: "Friend Carl—Was in office Sat. Rec'd. letter from Carol [plaintiff's attorney]—Wot do U want me to tell him? Where were you? Will you be in all next week—have another Knoxville deal—ORV" It is undisputed that defendant never told plaintiff how much he actually paid for the property.

137

According to defendant's testimony, at a time when the two were viewing some other real estate, plaintiff volunteered that he would pay $35,000 for the property in question. Defendant testified that when defendant asked plaintiff, "Will you buy it for $35,000?" and plaintiff replied affirmatively, defendant stated: "Well, I will look into it for you, but will you pay me a commission if I can buy it for $35,000?" By defendant's testimony, Spindler said, "No, $35,000 is my total price." According to defendant's testimony, he replied, "Well, I will check into it, Carl."

Defendant himself testified that when Mr. Spindler first discussed this property with him, in the former's office, he told plaintiff that he "would find out if it could be purchased—I told him it was not listed with me, but I would find out how he could buy it."

On a later meeting, according to defendant, plaintiff reduced his offer to $32,000, stated that he would not pay Krieger a commission in addition, but agreed to pay $32,000 if Krieger bought the property and resold it to plaintiff for $32,000. Plaintiff categorically denied any such agreement that defendant should purchase the property on his own account and then resell it to plaintiff.

The two parties were the only witnesses to most of the negotiations. Their testimony, together with the writings offered as exhibits, comprise the record in this case. In the foregoing paragraphs, we have summarized the evidence in the record, which we have examined carefully and in detail.

Defendant relies in a very large measure on two written instruments, the offer to purchase and letter dated April 6, 1955, "confirming" the terms, which he insists not only require application of the parol evidence rule, but constitute a binding contract by which he agreed to sell the realty to the plaintiff and the plaintiff agreed to buy it from defendant. He urges

138

that the relationship of the parties as thus established was that of buyer and seller and not principal and agent. Defendant has devoted a considerable portion of his brief and argument to the proposition that the parol evidence rule is applicable to the case, and, therefore, plaintiff is barred from offering the testimony which he did concerning the relationship of the parties and the negotiations surrounding acquisition of the property.

We shall first consider the question of the applicability of the parol evidence rule. The parol evidence rule has been stated in various terms but the broad general rule may be stated as follows: Parol or extrinsic evidence is inadmissible to vary, alter or contradict a written instrument where the instrument is complete on its face, unambiguous, valid, and there is no fraud, duress, mistake, or illegality in respect of the instrument, I.L.P. Evidence, § 251, 20 Am. Jur., Evidence, § 1091. Parol or extrinsic evidence may be admitted, however, to disprove the legal existence of a binding contract, Kilcoin v. Ortell, 302 Ill. 531; Bell v. McDonald, 308 Ill. 329. Thus, lack of delivery of the instrument or a defect in its execution may be shown by extrinsic evidence since the rule presupposes the due execution and delivery of the writing with intent to bind the parties. Waters v. Lawler, 297 Ill. 63; Jost v. Cornelius, 334 Ill. App. 279. In the present case, the offer to purchase upon which defendant heavily relies was not signed by the defendant, and so far as appears from the record, no copy of that instrument was ever made for or delivered to the plaintiff. It thus appears that the offer to purchase did not constitute a valid binding contract and was not intended by the parties as a single integrated memorial. To that kind of memorial alone is the parol evidence rule applicable; see Wigmore on Evidence, (3rd ed., 1940) Vol. 9, Sec. 2425. The letter dated April 6, 1955, "confirming"

139

plaintiff's agreement with defendant is ambiguous and is quite as consistent with plaintiff's version of the relationship and understanding between the parties as with defendant's version.

 There is another reason why the parol evidence rule has no application here. Extrinsic evidence is admissible to show fraud, duress, mistake, or illegality in connection with a written instrument, I.L.P. Evidence 277, 24 Am. Jur., Fraud and Deceit, Sec. 267; Lehman v. Hill, 414 Ill. 173; Haugens v. Foster, 320 Ill. App. 212, including nondisclosures, misrepresentations and violations of fiduciary duty; Blanchard v. Lewis, 414 Ill. 515. Where, as in the present case, plaintiff claims that the defendant as his agent made a secret profit from his agency by means of nondisclosures, misrepresentations and violations of fiduciary duty, it cannot be seriously contended that the parol evidence rule bars admission of such extrinsic evidence. Numerous courts have observed that it was never intended that the parol evidence rule be used as a shield to prevent proof of fraud, or that a person could arrange to have an agreement, obtained by him through fraud exercised upon the other contracting party, reduced to writing and formally executed and thereby deprive the courts of the power to prevent him from reaping the benefits of his chicanery, Ferguson v. Koch, 204 Cal. 342, 268 P. 342, 58 A.L.R. 1176; Arnhold v. National Aniline & Chemical Co., 20 F.2d 364, 56 A.L.R. 4, and following annotation. A case quite closely in point on its facts is Lavalleur v. Hahn, 152 Iowa 649, 132 N.W. 877. There defendant real estate broker was employed by plaintiffs to purchase a certain farm for them as cheaply as he could, but not over $80 per acre, and he agreed to do so. Defendant then bought the farm in his own name for $75 an acre and reconveyed it to plaintiffs, telling them he had to pay $80 per acre while he made a secret profit of $5

140

per acre. By means of two contracts of sale naming himself as seller and plaintiffs as buyers, defendant made it appear that in purchasing the farm he was acting as principal on his own account. The Iowa Supreme Court held that the defendant could not take refuge in the parol evidence rule and that oral or extrinsic evidence showing that he was the broker or agent for plaintiff in the purchase of the farm should have been admitted and considered.

Having thus determined that the master in chancery did not err in considering plaintiff's evidence, we reach the principal question, namely, whether the evidence supports the decree, and whether the master and chancellor properly found that defendant was plaintiff's agent.

██ It is well established that where a master in chancery hears evidence and makes findings thereon and such findings are approved by the chancellor, who considers the evidence on exceptions taken thereto, such findings will not be disturbed by the reviewing court unless manifestly against the weight of the evidence, Rose v. Dolejs, 1 Ill.2d 280; Freymark v. Handke, 415 Ill. 360. Where there is a dispute as to a material fact, the findings of the master in chancery approved by the chancellor must be allowed to stand unless it can be said that such finding is clearly against the weight of the evidence, Ginther v. Duginger, 6 Ill. 2d 474. The master was in a better position to judge as to the question of the credibility of the two interested witnesses than we are. Defendant's communications with plaintiff, though ambiguous in some respects, nevertheless tend strongly to corroborate plaintiff's testimony and to discredit defendant's testimony. We believe the finding of the master in chancery that plaintiff employed defendant as his broker and special agent to purchase the premises in question

141

and that defendant so acted in his behalf was not contrary to the manifest weight of the evidence.

Certain facts are undisputed. Defendant was a well-known Peoria real estate broker who held himself out to the public as such. Plaintiff had made use of his services as a broker on one prior occasion. After his negotiations with the owners of the real estate, defendant wired plaintiff that the trip was a success. In the other writings to plaintiff, defendant stated, "We closed our deal today on the Knoxville property. Completely forgot to relate to you the interesting details in the acquisition of the Nebraska & Knoxville site *for you.*" (Emphasis supplied) "Dear Friend Carl—I sure appreciate your letting me paint sign on wall. I ordered it—here's what it will say—This entire corner sold by Marquette Real Estate Co."

Defendant concedes in his brief that his interest in the property was solely directed toward its acquisition by the plaintiff. Both parties testified that the matter of a real estate broker's commission for defendant was discussed. Plaintiff's testimony was to the effect that it was finally agreed that defendant was to purchase the property for him at the best price obtainable but that in no event was the aggregate cost to exceed $32,000 (including defendant's broker's commission) and assumption of $400 in special assessments. Defendant denied any such understanding and testified that plaintiff stated that he would pay defendant no broker's commission but at defendant's suggestion agreed that if defendant purchased the property, plaintiff would pay him $32,000 for it.

This court and other courts have held that no particular form of words is necessary to constitute an employment as agent, Purgett v. Weinrank, 219 Ill. App. 28. It was for the trier of fact to determine from the evidence which party was telling the truth, and if he believed the plaintiff's version of the conversations

he was warranted in finding that a contract of agency had been entered into by the parties. Defendant cites and relies upon two cases which we do not regard as being in point. In the first, Fish v. Teninga, 330 Ill. 160, a real estate broker bought some property for himself after the plaintiff claimed to have employed the broker to buy it for him. Plaintiff sued to declare a constructive trust. Under the facts in that case the court held that the chancellor's finding that there was no agency relationship between the parties was proper. However, there the broker had been negotiating to buy the property for his own firm prior to the time that the plaintiff approached him. There had been previous ill-will between the parties. The likelihood that defendant would accept such employment by plaintiff when he himself had been negotiating to purchase the property was very remote. The direct evidence of any agency contract was meager and sharply contradicted. Obviously the facts there are markedly different from the facts here. In Cardella v. Perille, 148 Ill. App. 76, there was no question of the broker buying on his own account, but the issue was whether the broker was the agent of plaintiffs, who were the buyers, or the agent of the seller. Upon the facts there the court concluded with good reason that the broker was the agent of the seller.

A case closely in point is Hyman v. Burmeister, 216 Ill. App. 98. There Hyman, one of the plaintiffs, had gone to the defendant real estate broker and requested him to purchase certain real estate for plaintiffs at the best price obtainable. Subsequently, defendant told plaintiff that the owners wanted $14,000 for the property. Hyman replied that that was too much and a few days later defendant said he could get it for $13,000 and Hyman replied that that also was too much. Finally defendant told Hyman the best he could do was $11,000. When plaintiff asked to meet the owners

143

the defendant advised against it lest the plaintiff appear overanxious. When plaintiff asked defendant whether he would have to pay him a commission, defendant replied that he would not as he always got the commission from the other side. Defendant caused the property to be deeded to a third person and then deeded by the third person to the plaintiffs. The evidence showed that defendant bought the property for $9,500 and sold it to plaintiffs for $11,000. Plaintiffs sued to recover the $1,500 difference. The language of the court in the Hyman case is appropriate in the present case, pages 100–101:

"The position of the defendant Burmeister seems to be that having learned that Hyman wanted the property in question and was willing to pay $11,000 for it, he had the right to buy it himself for $9,500 and then turn it over to Hyman for the price of $11,000, which had been agreed upon.

"In our opinion that position is untenable by reason of the fact that the evidence shows that Burmeister was the agent of Hyman to purchase the property, notwithstanding the fact that when Hyman asked as to whether he would have to pay a commission on the deal, Burmeister said he would not, that they 'always got commissions from the other side.' When Hyman told Burmeister he wanted to procure the property in question and asked him to get a price on it and Burmeister did so, or purported to do so, and reported the price the owners were asking, he became the agent of Hyman in the transaction and owed him all the duties of an agent, and if he, after Hyman agreed to a price of $11,000, went out and purchased the property himself at a lower figure than that and then had it transferred to Hyman at the price he had agreed to pay, he is liable for the difference in this action."

The reported decisions in Illinois include numerous cases involving real estate brokers wherein the duties

144

of the agent to his principal are well defined. One of the leading cases is that of Lerk v. McCabe, 349 Ill. 348. There the Supreme Court stated, page 360:

"The relation of principal and agent is one of trust and confidence, and where such confidence is reposed and such relation exists it must be faithfully acted upon and preserved from any intermixture of imposition. The rule is the same no matter how large or how small the commission paid may be or whether the agent is a mere volunteer at a nominal consideration (Perry v. Engel, 296 Ill. 549.) An agent acting for the purchaser of land, whether by appointment or as a volunteer, must see that he meets fairly and squarely the responsibility of his position and does not take any advantage, either for his own gain or to the injury of the person whom he represents. (Salsbury v. Ware, 183 Ill. 505.) The rule is well established in equity that the relation existing between principal and agent for the purchase or sale of property is a fiduciary one, and the agent in the exercise of good faith is bound to keep his principal informed on all matters that may come to his knowledge pertaining to the subject matter of the agency (Reiger v. Brandt, 329 Ill. 21.) An agent must not put himself, during the continuance of his agency, in a position adverse to that of his principal. To the latter belongs the exercise of all the skill, ability and industry of the agent. If a party employs an agent to make a purchase of land he is entitled to all the skill, ability and industry of such agent to make the purchase on the best terms that can be had. (Cottom v. Holliday, 59 Ill. 176.) An agent cannot deal for his own advantage with the things purchased for his principal, or become a seller or buyer of them, because of his confidential relation and his duty to disclose to his principal every fact, circumstance or advantage in relation to the purchase which may come to his knowledge. (McDonald v. Fithian, 1 Gilm. 269; Strong v.

Lord, 107 Ill. 25.) An agent cannot directly or indirectly acquire an interest in his principal's business without the principal's consent freely given and with full knowledge of every matter known to the agent which might in any way affect the principal's interest, and it is of no consequence that no fraud was intended or that no advantage was derived by the agent. (Fox v. Simons, 251 Ill. 316.) It is a settled rule in this State that transactions of parties between whom a fiduciary relation exists are *prima facie* voidable on grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contract shows by clear and convincing proof that he has acted in perfect good faith and has not betrayed the confidence reposed in him. (Thomas v. Whitney, 186 Ill. 225; Casey v. Casey, 14 id. 112.) It is the confidential fiduciary relation existing between the parties which gives rise to such suspicion. If a reasonable suspicion exists that the confidence has been abused the contract will be set aside. (Dowie v. Driscoll, 203 Ill. 480; Beach v. Wilton, 244 id. 413.) And this though the contract is such that had no fiduciary relation existed the contract would not be disturbed . . ."

 This court has applied the same principles in its decisions, for example, Quist v. Dorn, 301 Ill. App. 264; Huston v. Pusey, 243 Ill. App. 157. These principles rest on the sound ground that the proscribed activities may tempt the agent to swerve from full adherence to his fiduciary obligations, to abandon the interest of his principal in favor of his own, and even to advance his personal ambitions to the detriment of his principal. The law is clear that such adverse interests or self-dealing will bar the agent from any recovery for his services unless the agent completely discloses the extent of the adversity of interest and the

146

principal, having such information, consents thereto, Blanchard v. Lewis, 414 Ill. 515; Fox v. Simons, 251 Ill. 316; and the agent must account to his principal for any secret profits made at his principal's expense, Sams v. Rigg, 339 Ill. App. 25.

From the facts as disclosed by the record it seems plain that the defendant did not fulfill his fiduciary duties as plaintiff's agent, and plaintiff was entitled to an accounting for the profits which defendant derived in violation of his trust. We find no error in the record and the decree of the chancellor is therefore affirmed.

Decree affirmed.

CROW and WRIGHT, JJ., concur.