**In the Matter of Dipak BHAYANI, Debtor.**

**Dipak Bhayani, Plaintiff,**

v.

**Sue Sood and Realty South Inc., d/b/a Realty Executives South, Inc., Defendant.**

**Bankruptcy No. 01 B 12429. Adversary No. 01 A 00875.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 5, 2003.

Ardwin E. Boyer, Esq., Newman & Boyer, Ltd., Chicago, IL, for Movant or Plaintiff.

David M. Jankura, Esq., David M. Jankura & Assoc., for Respondent or Defendant.

Tom Vaughn, Chapter 13 Trustee.

## RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER,
Bankruptcy Judge.

### Background/History

Plaintiff Dipak Bhayani ("Plaintiff or Bhayani") is a Chapter 13 debtor. He brought the instant Adversary Complaint charging Defendant, Sue Sood ("Defendant or Sood"), with violating provisions of the Illinois Real Estate Licensing Act of 2000, 225 ILCS 454/1–1 *et. seq.* (the "Act"). Plaintiff alleges that he hired Sood, a licensed real estate broker, to represent him in the purchase of a property in Markham, Illinois, and that she then acquired the property for herself. Plaintiff seeks imposition of a constructive trust so that Plaintiff may recover the real estate allegedly taken in violation of Sood's fiduciary duty (Count I), judgment that Sood violated the Act (Count II), and compensatory and consequential damages pursuant to the Real Estate Recovery Fund, 225 ILCS 454/20–85 (Count III).

### RECOMMENDED CONCLUSIONS OF LAW

█ This Court has "related" jurisdiction because any recovery obtained by Bhayani will affect the distribution to creditors. *Matter of FedPak Systems, Inc.,* 80 F.3d 207, 213–14 (7th Cir.1996). This is true even though Bhayani's Chapter 13 Plan has been confirmed, since § 1329 of the Bankruptcy Code allows for modification of his Plan to distribute to his creditors any funds recovered from the instant suit. 11 U.S.C. § 1329(a)(1). This matter

was referred here by the District Court pursuant to 28 U.S.C. § 157(a) and District Court Internal Operating Procedure 15(a). Venue lies here under 28 U.S.C. § 1409(a).

The case came to trial, and the parties rested. Following consideration of the evidence and argument of the parties, for reasons stated below, since this Court's authority is only under related jurisdiction, it is recommended that the District Court enter judgment for Bhayani on Count II, and for Defendants on the remaining Counts. It's recommended that the District Court make and enter the following Findings of Fact and Conclusions of Law:

## RECOMMENDED FINDINGS OF FACT

1. Plaintiff is a businessman who at all times mentioned herein owned a lot at 159th Street in Markham, Illinois (the "Markham property").

2. Sue Sood has been a licensed real estate broker since 1989. She is currently half-owner of Realty Executives South, Inc. where she has been employed since 1993.

3. Some months prior to February 2000, Bhayani had contacted the owners of a residence located at 15837 South Albany Street, Markham, Illinois (the "Albany property") that adjoined his lot and asked if they wanted to sell their home. He was interested because acquisition of the Albany property when combined with the parcel Plaintiff already owned would enhance the commercial value of both parcels. However, the then owners told him that they did not wish to sell the property.

4. In February 2000, Bhayani noticed a "for sale" sign at the Albany property. On February 17, 2000, he telephoned Sue Sood to arrange a showing of the property. For reasons stated below, Plaintiff's testimony that he asked Sood to represent him

in attempting to purchase the Albany property is found credible, not the denial of Sood on that point. After speaking with Bhayani on the phone, Sood sent him a listing showing that the property was for sale. She also sent him a comparative market analysis of houses in the related subdivision. Although, Bhayani did not know Sood personally, he knew that she was a real estate broker because she had sold property for some of his friends.

5. The Albany property had been purchased in foreclosure by Ocwen Federal Bank, so Sood contacted a bank representative to schedule a showing of the property for Bhayani on February 18, 2000.

6. Sood and Bhayani met at the Albany property on February 18. Bhayani said that he thought the asking price of $48,000 was too high. He commented that the home on the property would need substantial repair, and then told Sood that he wanted to have the property appraised.

7. Two days later (February 20, 2000), Sood signed a contract to buy the Albany residence for herself for $37,000. (Plaintiff's Exhibit 11).

8. On February 21, 2000, Bhayani called Sood to inquire about a notation on the listing he had received from Sood. The notation stated that the real estate agent had to obtain a "Seller's Addendum" prior to writing a contract on the home. Bhayani wanted to know what this Addendum was before he made an offer to buy the property.

9. A copy of the Seller's Addendum was faxed to Bhayani on February 22. The fax cover sheet shows that the fax was sent by Sue Sood, though she claimed at trial that she did not send the fax. The "Addendum" was a standard form contract used by Ocwen Bank. However, Ms. Sood did not inform Plaintiff that she had al-

ready signed a contract to purchase the Albany property for herself.

10. On February 24, 2000, George Paluch, a commercial real estate broker, contacted Bhayani about selling Plaintiff's lot to Wendy's Old Fashioned Hamburgers of New York, Inc. ("Wendy's"). Paluch was attempting to find a location for a Wendy's restaurant when a title search showed that Bhayani owned property that might be a suitable location. Paluch had known Bhayani since the mid–1980's. On February 24, Bhayani faxed a diagram of the site to Paluch showing the lot he already owned and the adjacent Albany property, with a notation "House is Available." Bhayani told Paluch that he was attempting to acquire the Albany property. Paluch was interested in the Albany property as well as the lot already owned by Bhayani (collectively the "Markham property") in order to accommodate two users on the site, a Wendy's restaurant and another noncompeting fast-food outlet. Paluch told Wendy's that Bhayani was in the process of acquiring the Albany property.

11. Bhayani called Sood on March 4 and left a voice mail stating that he wished to buy the Albany property. Sood never responded to his voice mail, nor did she respond to Bhayani's repeated attempts to contact her about the Albany property.

12. Bhayani first discovered that Sood had purchased the Albany property when he asked a carpenter working on the property what he was doing.

13. On November 20, 2000, Wendy's signed a letter of intent to purchase the Markham property along with the Albany property for $350,000. Paluch testified that the Albany property was an integral part of the deal with Wendy's, and that Bhayani's land was only worth $25,000 without the Albany property. The land at this location had substantial commercial value, as evidenced by the fact that Bhayani sold a nearby parcel to another fast-food franchise for $303,000 in 2001.

14. Paluch testified that Wendy's backed out of the deal to purchase the "Markham" property after it became clear that Bhayani did not own the Albany parcel. According to Paluch, the site was unsuitable for a fast-food franchise without the Albany property because it lacked the space to accommodate the landscaping and parking requirements of a fast-food business.

15. There was no written agreement between Plaintiff and Defendant.

### Count I (Constructive Trust)

■ Under Illinois common law principles, the relationship between a would be purchaser of realty and a real estate broker was that of principal-agent. *Spindler v. Krieger*, 16 Ill.App.2d 131, 147 N.E.2d 457, 465 (1958). All that was required to create such a relationship was for a buyer to request a broker's assistance for purchase of a particular piece of property. *Stefani v. Baird & Warner, Inc.*, 157 Ill. App.3d 167, 109 Ill.Dec. 444, 510 N.E.2d 65, 68 (1987). However, the Real Estate License Act of 2000 abrogated common law rules governing the relationship between a broker and his or her client:

> This Article 15 is enacted to govern the relationships between consumers of real estate brokerage services and real estate brokers.... This Article applies to the exclusion of the common law concepts of principal and agent and to the fiduciary duties, which have been applied to real estate brokers, salespersons, and real estate brokerage services.

225 ILCS 454/15–5(a).

■ Constructive trusts arise in cases of actual or constructive fraud or where there has been a breach of a fiduciary duty. *Amendola v. Bayer*, 907 F.2d 760, 762 (7th

Cir.1990). Bhayani has not averred fraud, so the only basis for the constructive trust he seeks would be a common law claim for breach of fiduciary duty, which was abrogated by the Act. Therefore, Bhayani's claim for constructive trust must yield to the legislature's clearly expressed intent for claims against brokers to be brought only for remedies permitted under the Act. Therefore, he may not recover on a constructive trust theory.

### Count II (Damages under the Act)

Licensed brokers are deemed to be agents of any interested buyer ("consumer") with whom they are working unless the parties have a written agreement stating that there is no agency relationship, or the broker has been engaged to perform only "ministerial acts." 225 ILCS 454/15–10(1)–(2). Ministerial acts are defined in the Act:

> "Ministerial acts" means those acts that a licensee may perform for a consumer that are informative or clerical in nature and do not rise to the level of active representation on behalf of a consumer. Examples of those acts include without limitation (i) responding to phone inquiries by consumers as to the availability or pricing of brokerage services, (ii) responding to phone inquiries from a customer concerning the price or location of property, (iii) attending an open house and responding to questions about the property from a consumer,(iv) setting an appointment to view property, (v) responding to questions of consumers walking into a licensee's office concerning brokerage services offered or particular properties, accompanying an appraiser, inspector, contractor or similar third party on a visit to a property, (vii) describing a property or a property's condition in response to a consumer's inquiry, (vii) completing business or factual information for a consumer on an

offer or contract to purchase on behalf of a client, (ix) showing a client through a property being sold by an owner on his own behalf, or (x) referral to another broker or service provider.

225 ILCS 454/1–10.

■■■ Sood argues that she only performed ministerial acts for Bhayani and that there was never any discussion of an agency relationship between her and Bhayani. But there is nothing in the Act that requires an agreement, written or otherwise, to establish an agency relationship. The only requirement to form an agency relationship between a broker and his or her client is an act by the broker and consent by the principal. *Letsos v. Century 21–New West Realty*, 285 Ill. App.3d 1056, 221 Ill.Dec. 310, 675 N.E.2d 217, 223 (1996). Consent may be oral, written, or implied from the conduct of the parties. *Id.* An agency relationship may be established by circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances. *Kirkruff v. Wisegarver*, 297 Ill.App.3d 826, 231 Ill.Dec. 852, 697 N.E.2d 406, 410, (1998).

■■■ Both parties agree that there was no written agreement between them disavowing an agency relationship. Indeed, Sood testified that she never used written contracts. Thus, it is left to the court to determine if evidence adduced at trial supports Sood's assertion that she only performed ministerial acts. Clearly, if taken in isolation, parts of Sood's conduct on behalf of Bhayani could be considered as ministerial (such as her faxing a copy of the listing in response to his telephone inquiry regarding the property, or her contacting the owner to schedule a viewing of the property). But we must look to the dealings of Sood with Plaintiff

as a whole to discern whether the parties formed an agency relationship.

Bhayani testified that he told Sood that he wanted her to represent him for the purchase of the home when he first spoke to her on the telephone. Sood contradicted this testimony; she stated that Bhayani was only interested in the market price of lots in his subdivision. But if that was the case, why would she schedule a showing of the Albany property for the very next day after she spoke to Bhayani. It would make no sense for Sood to show the property to Bhayani unless he had expressed an interest in purchasing it. Thus, Sood's version of the initial conversation is unbelievable.

Sood's credibility is further damaged by her claim that during the showing, Bhayani told her he did not want to buy the home because it needed too much work. Yet, a few days later when Bhayani contacted her to inquire about the contract "Addendum," she faxed a copy of the Addendum to him. She had no reason to send that document unless she knew Bhayani wanted to buy the property. Sood attempts to escape this issue by claiming that she never sent the contract Addendum to Bhayani, but the fax cover sheet says that it was sent by Sood. Her explanation that the Addendum must have been sent by her secretary without her knowledge is not credible.

On the other side, Sood seeks to undermine Bhayani's credibility by asking why he did not buy the property outright if he knew that he could sell it to Wendy's at a substantial profit. Even if the purchase price was $48,000, she argues that Bhayani should have been eager to buy the property if he knew that he could sell the land for $350,000. Moreover, why would he care about the cost of renovating the property if he intended to demolish the residence to make way for a Wendy's restaurant? Although Bhayani opens himself up to these questions in his briefs by contending that he intended to sell the property to Wendy's from the outset of his efforts to purchase the parcel (Plaintiff's Proposed Conclusions of Law p. 2), careful review of the chronology of events shown by evidence does provide the answer.

Paluch testified that he approached Bhayani about selling his land to Wendy's near the end of February. This is backed up by the date on the facsimile transmission marking on the diagram of the proposed site that Bhayani sent Paluch, which is dated February 24, 2000. Paluch also testified that Bhayani told him during this same conversation that he was trying to acquire the Albany property. Thus, Bhayani did know about the Wendy's offer on February 18 when he made the walkthrough with Sood. Apparently, Bhayani's original plan was to keep the residence intact because he did not yet have a prospective purchase. This would explain why he was complaining about the renovation cost of the property during the showing. Moreover, complaining about the property's condition would be a normal comment by a buyer seeking a lower price. Of course, Bhayani's plans changed, as did the economics of the deal, after he was contacted by Paluch on February 24. Finally, Paluch's testimony serves to bolster Bhayani's assertion that he told Sood that he wanted to buy the Albany property because Paluch testified that Bhayani told him he was in the process of acquiring the Albany property when the two spoke on February 24. In sum, it is clear that Bhayani engaged Sood as an agent for the purchase of the Albany property. Therefore Sood owed Bhayani the duties that the Act imposes on a licensed broker.

A broker owes a duty of loyalty and honesty to his or her client. 225 ILCS 454/15–15(a)(2)(F), 454/15–25(a), and must

not put personal interests ahead of those of a client. *Id.* Brokers must disclose all material facts related to a transaction, of which they have actual knowledge. 225 ILCS 455/15–15(2)(C). The relationship between a client and broker is not determined by whether there has been a payment or the promise of payment for the broker's services.225 ILCS 454/15–40.

The evidence adduced at trial shows that Sood breached her duty to Bhayani. Specifically, she put her own self-interest ahead of those of Bhayani. The facts in this case are similar to those in *Spindler v. Krieger,* 16 Ill.App.2d 131, 147 N.E.2d 457 (1958). In *Spindler,* as here, the broker was not the listing broker for the property at issue, but he agreed to represent the prospective buyer for the purchase of the land. The defendant in that case had no knowledge that the land was even available until the buyer contacted him, just as in the present case. However, instead of representing the buyer, the broker secretly bought the land for himself. Thus, applying agency principles, the court concluded that the defendant breached his fiduciary duty to the plaintiff. *Id.* at 465.

The description of fiduciary duties described in the pre-Act *Spindler* opinion is the same as those owed under the Act. Therefore, Sood was guilty of violating the Act's prohibition on self-dealing. She had a duty to represent Bhayani rather than herself in the purchase of the Albany property. See 225 ILCS 454/15–15(a)(2)(F). Further, her failure to disclose that she had made an offer on the property when Bhayani contacted her on February 21, 2000, to obtain a copy of the contract Addendum violated her obligation to provide honest dealing and full disclosure. See 225 ILCS 454/15–25(a), 454/15–15(a)(2)(C).

Accordingly, Bhayani may recover his actual compensatory damages under Section 454/15–70 of the Act. The uncontroverted evidence presented at trial showed that the Albany property was worth $350,000 if bundled with Bhayani's adjacent lot, which by itself was valued at only $25,000. (See Paluch Deposition in evidence ¶¶ 24–28). Thus, the value that Bhayani would have received if Sood had not purchased the property for herself is the $325,000 ($350,000–$25,000), less the $37,000 that Sood paid to purchase the Albany property, or $288,000.

### Count III (Recovery from the OBRE Fund)

Under the Act, the Office of Banks and Real Estate (OBRE) maintains a fund for victims of misconduct by licensed brokers or their unlicensed employees. 225 ILCS 454/20–85. "The aggrieved person may recover, by order of the circuit court of the county where the violation occurred, an amount of not more than $10,000 ... together with attorney fees ... not to exceed 15% of the amount of the recovery ordered paid from the fund." *Id.* The procedure for collecting from this fund is set forth at 225 ILCS 454/20–90. One of the requirements is that the plaintiff must notify the OBRE of the commencement of the action within seven days thereof. 225 ILCS 454/20–90(c).

The statute thereby mandates that OBRE be given an opportunity to intervene in an action seeking recovery from the fund. No such opportunity or requisite notice was proven here. In light of that deficiency, the claim for damages under Count III must be rejected.

### CONCLUSION

Accordingly, in this "related jurisdiction" case, it is recommended the District Court enter judgment in the amount of $288,000 in favor of Plaintiff on Count II, and in favor of Defendants on Counts I

and III, and for each party to bear his and her own costs.